PLEASANT SUMMIT LAND CORPORATION, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Pleasant Summit Land Corp. v. Commissioner
Docket Nos. 30159-82; 23782-85; 28283-85.
United States Tax Court
T.C. Memo 1987-469; 1987 Tax Ct. Memo LEXIS 465; 54 T.C.M. (CCH) 566; T.C.M. (RIA) 87469; September 17, 1987; As amended September 24, 1987; Affirmed In Part; Reversed In Part and Remanded November 28, 1988 Richard S. Kestenbaum and Bernard S. Mark, for the petitioners. C. Ellen Pilsecker and Leslie J. Speigel, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN: Judge: In these consolidated cases, respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Additions to Tax
Docket No.
Taxpayers
Year
Deficiency
Sec. 6651(a) [2]
Sec. 6621(d)
30159-82
Pleasant, Summit
5/31/79
$ 236,840.00
--
--
23782-85
Estate of
1981
8,708.00
$ 278.00
120% of
Melvin A.
interest on
Isaacson
$ 8,708.00
28283-85
George Prussin
1978
264,571.20
--
--
and Sharon
1979
141,496.00
--
--
Prussin
In his Answer in docket No. 28283-85, respondent asserted additional interest pursuant to section 6621(d). After concessions, the issues for decision are: (1) Whether *469 petitioner Pleasant Summit Land Corporation is liable for the personal holding company tax imposed by section 541. (2) Whether petitioners Isaacson and Prussin are entitled to deduct their distributive shares of a certain limited partnership's reported losses. (3) Whether petitioners Prussin are entitled to an investment tax credit attributable to a certain limited partnership. (4) Whether petitioners Isaacson and Prussin are liable for additional interest imposed by section 6621(c), formerly section 6621(d). FINDINGS OF FACT Many of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Pleasant Summit Land Corporation (PSLC) is a corporation whose principal place of business was in West Orange, New Jersey, when its petition was filed. Melvin Isaacson (Isaacson) and Miriam Isaacson resided in Torrington, Connecticut, when their petition was filed. George Prussin (Prussin) and Sharon Prussin resided in Alpine, New Jersey, when their petition was filed. Prior to May 3, 1978, Lester Robbins (Robbins) and a number of other individuals owned Summit House, an apartment complex in West Orange, New *470 Jersey. On May 3, 1978, PSLC agreed to purchase Summit House from Robbins, who held the property in trust for its other owners. Documentation reflecting the agreement states that PSLC agreed to pay $ 4,200,000 for the property. On or about June 1, 1978, PSLC purchased Summit House. The closing statement reflecting the sale and the deed from Robbins to PSLC each state that the real property was sold for $ 3,650,000; the closing statement allocates the remainder of the total purchase price to personal property. PSLC made a $ 250,000 cash down payment, gave Robbins a mortgage in the amount of $ 1,350,000, and took the property subject to a $ 2,600,000 first mortgage. The closing statement reflecting PSLC's purchase was dated June 1, 1978, as was the mortgage note payable to Robbins. The deed from Robbins to PSLC and the mortgage indenture in favor of Robbins were dated "as of" June 1, 1978, but were executed on June 14, 1978. PSLC then sold the apartment buildings and the personal property, but not the underlying land, to Mount Orange Realty Corporation (MORC), its wholly owned subsidiary. The purchase and sale agreement between PSLC and MORC was executed on behalf of each *471 entity by Bentley J. Blum, the president, secretary, treasurer, and director of MORC and the president and sole shareholder of PSLC. The agreement states that MORC agreed to pay $ 5,200,000 for the property. The deed from PSLC to MORC states that the buildings were sold for $ 3,681,600; the agreement allocates the remainder of the total purchase price to personal property. MORC agreed to make a $ 500,000 cash down payment and to give PSLC a nonrecourse wraparound mortgage in the amount of $ 4,700,000. The purchase and sale agreement between PSLC and MORC was dated June 1, 1978. The deed from PSLC to MORC was dated "as of" June 1, 1978, but was executed on June 14, 1978. The mortgage note payable to PSLC and the mortgage indenture in its favor were each dated "as of" June 1, 1978. PSLC subsequently sold MORC to Pleasant & Summit Associates (PSA), a New Jersey limited partnership. Petitioners Isaacson and Prussin were PSA limited partners. The purchase and sale agreement between PSLC and PSA states that PSA agreed to pay $ 2,559,200 for all issued and outstanding MORC stock. PSA gave PSLC a nonrecourse mortgage secured by MORC stock for the full amount of the purchase price. *472 MORC then transferred all of its assets to PSA and dissolved. The purchase and sale agreement between PSLC and PSA was dated June 14, 1978. Although a stock escrow agreement between PSLC, MORC, PSA, and an escrow agent was dated June 15, 1978, the stock transfer document executed by PSLC was dated June 1, 1978. The mortgage note payable to PSLC was dated "as of" June 1, 1978. The mortgage indenture in favor of PSLC was also dated "as of" June 1, 1978, but was executed on June 15, 1978. PSA and PSLC entered into a 90-year ground lease covering the land underlying Summit House. The lease, dated June 1, 19778, provided for annual rental payments of $ 10,000. PSA could accrue all rental payments due during the first 10 years of the lease. Accrued but unpaid rental amounts were to bear interest at a rate of 9 percent per annum. Most of the documents reflecting these and related transactions were dated without regard to the sequence in which key events allegedly took place. A partial "chronology" of the transactions in issue, as reflected in the pertinent documents, may be set forth as follows: May 3, 1978
PSLC agrees to purchase
Summit House from Robbins.
June 1, 1978
PSLC purchases Summit House.
MORC issues stock to PSLC.
PSLC sells property to MORC.
PSLC transfers MORC stock to PSA.
MORC assigns assets to PSA.
PSA and PSLC execute ground lease.
June 2, 1978
PSLC and MORC are incorporated.
June 6, 1978
PSA is formed.
June 14, 1978
PSA agrees to purchase all MORC stock
from PSLC.
MORC dissolves.
June 15, 1978
PSA, PSLC, and MORC enter into stock
transfer escrow agreement.
*473 On November 17, 1978, PSLC and PSA refinanced the first mortgage on the property by obtaining a $ 2,600,000 loan from Equitable Life Assurance Society of the United States (Equitable). The loan had been approved by Equitable on June 2, 1978. Neither PSLC nor PSA was personally liable for the Equitable mortgage. Equitable required fire and extended coverage insurance in the amount of $ 2,745,000, with a 90 percent coinsurance clause. Prior to acquiring the property, PSA had issued and distributed a Confidential Offering Memorandum (memorandum). Potential investors were advised that operation of the property was expected to produce no cash flow for at least 15 years. The memorandum stated that: [I]ncome in the form of cash distributions must not be considered as an investment objective. The investment objective of an investor in the Partnership should be appreciation in value of the Property and the current tax benefits achieved primarily through the use of accelerated depreciation methods allowed by the [Internal Revenue] Code and the accrual of expenses. * * *
Potential investors were advised that the financial benefits to be derived from an investment in the *474 partnership would generally depend upon the investor's tax bracket. The memorandum focused primarily, if not exclusively, on expected tax benefits. In conjunction with the memorandum, PSA provided prospective investors with a Projected Schedule of Income and Expenses as well as a Projected Schedule of Cash Flow. The schedules, which depict the first 10 years of the partnership's operations, projected substantial annual losses and no distributions of cash to investors. Potential limited partners also received the following projection of expected tax benefits: PLEASANT & SUMMIT ASSOCIATES
PROJECTED SCHEDULE OF TAXABLE (LOSS), TAX BENEFIT (COST) AND
EXCESS OF TAX BENEFIT (COST) OVER CAPITAL CONTRIBUTIONS
FOR A LIMITED PARTNER ACQUIRING ONE UNIT
Years Ending December 31, 1978-1987
Capital
Taxable
Ratio
Tax Benefit (Cost)
Year
Contributions
(Loss)
to 1
50%
60%
70%
1978
$  21,000
$ ( 57,400)
2.73
$ 28,700
$ 34,400
$ 40,200
1979
17,500
( 46,000)
2.63
23,000
27,600
32,200
1980
15,000
( 40,000)
2.67
20,000
24,000
28,000
1981
12,500
( 36,300)
2.90
18,200
21,800
25,400
1982
9,500
( 35,600)
3.75
17,800
21,300
24,900
1983
7,500
( 33,800)
4.51
16,900
20,300
23,700
1984
7,500
( 34,000)
4.53
17,000
20,400
23,800
1985
7,500
( 29,300)
3.91
14,600
17,600
20,500
1986
7,000
( 29,800)
4.26
14,900
17,900
20,900
1987
7,000
( 30,600)
4.37
15,300
18,400
21,400
$ 112,000
$ (372,800)
3.33
$ 186,400
$ 223,700
$ 261,000
*475 Excess of Tax Benefit (Cost)
Over Capital Contributions
Year
50%
60%
70%
1978
$ 7,700
$ 13,400
$ 19,200
1979
5,500
10,100
14,700
1980
5,000
9,000
13,000
1981
5,700
9,300
12,900
1982
8,300
11,800
15,400
1983
9,400
12,800
16,200
1984
9,500
12,900
16,300
1985
7,100
10,100
13,000
1986
7,900
10,900
13,900
1987
8,300
11,400
14,400
$ 74,400
$ 111,700
$ 149,000
Although the schedules projected depreciation deductions derived from a "cost" basis of $ 7,759,200, the partnership's memorandum implied that the fair market value of the property was substantially lower than its reported cost. The memorandum stated that assessed values in West Orange, New Jersey, ranged between 72 to 100 percent of fair market value. During the years in issue, the assessed value of the property was reflected on the records of the West Orange tax assessor as follows: Assessment Date
Land
Building
October 1977
$ 155,000
$ 879,500
October 1978
155,000
1,096,200
October 1979
257,500
1,718,700
October 1983
864,000
4,613,000
After acquiring the property, PSA operated Summit House as rental housing. During *476 the years in issue, PSA expended the following amounts in connection with its operation of the property: 1978
1979
1981
Salaries
$ 13,890
$ 33,615
$ 38,271
Taxes
67,722
144,535
138,326
Repairs
6,830
18,789
21,456
Rubbish Removal
780
1,440
1,642
Insurance
20,171
10,689
21,137
Management Fees
13,549
18,193
21,044
Miscellaneous
371
2,054
196
Professional Fees
1,980
3,000
3,105
Supplies
3,395
5,908
6,860
Telephone
83
590
134
Utilities
16,360
16,044
95,550
Water
--
6,349
12,989
Gas and Oil
5,980
40,751
--
Licenses
290
160
100
Office Supplies
17
169
--
Exterminator
368
629
--
Advertising
--
1,804
141
During the years in issue, PSA "accrued" the following amounts in connection with its operation of the property: 1978
1979
1981
Ground Rent
$ 10,000
$ 10,000
$ 10,000
Management Fees
9,363
18,193
21,190
Interest
702,400
699,836
644,933
During the years in issue, PSA received rental income and other related income from the property as follows: Rental and
Taxable Year
Related Income
1978
$ 309,384
1979
603,262
1981
700,969
*477 PSA and PSLC transferred the land and the property to Pleasant and Summit Partners, an unrelated third party, on December 19, 1985. The total consideration was $ 7,000,000, of which $ 280,000 represented the sellers' real estate brokerage commission obligations which were assumed and paid by Pleasant and Summit Partners. On an income tax return for its taxable year ended May 31, 1979, PSLC computed its gain from the sale of the property to MORC under the "cost recovery" method of accounting. The company reported gross receipts of $ 1,276,869 attributable to the sale of the property, of which $ 962,000 represented "Collections of Sales Price on Property Sold" and $ 314,869 represented "Collections of Interest on Property Sold." Applying the "cost recovery" method of accounting, PSLC reported total income of $ 236,192 from the sale. In a notice of deficiency, respondent determined that PSLC should have computed its gain under the installment method. Respondent determined that PSLC realized a gain of $ 3,742,704 from its sale of the property to MORC, of which $ 464,069 was recognizable in PSLC's taxable year ended May 31, 1979. Respondent also determined that because over 60 *478 percent of PSLC's "adjusted ordinary gross income" was from interest, PSLC qualified as a personal holding company and was subject to the personal holding company tax imposed by section 541. As a result, respondent determined PSLC's total deficiency as follows: Corporate Income Tax Deficiency
$ 130,008
Personal Holding Company Tax
106,832
Total Deficiency
$ 236,840
On its Federal income tax returns, PSA claimed a depreciable basis in the property of $ 7,759,200. Of this amount, $ 7,259,200 represents nonrecourse financing: Principal Amount
Initial Obligor
Intitial Obligee
$ 4,700,000
MORC
PSLC
2,559,200
PSA
PSLC
$ 7,259,200
The remaining $ 500,000 of claimed basis is attributable to MORC's alleged cash down payment. On partnership returns for 1978, 1979, and 1981, PSA reported losses of $ 1,805,246, $ 1,494,243, and $ 1,307,798, respectively. In each of these years, a substantial portion of PSA's reported expenses was attributable to deductions for depreciation and interest. All reported interest expense, as well as all reported ground rent expense, represented obligations that had accrued but remained unpaid. But *479 for PSA's deductions for accelerated depreciation and interest, the partnership could not have reported a loss in any of the years in issue. On their 1978 and 1979 joint income tax returns, George and Sharon Prussin deducted George Prussin's distributive share of PSA's 1978 and 1979 losses. On their 1978 return, the Prussins also claimed an investment tax credit in the amount of $ 23,100 attributable to PSA. On their 1981 joint income tax return, Melvin and Miriam Isaacson deducted Melvin Isaacson's distributive share of PSA's 1981 loss. In notices of deficiency, respondent disallowed petitioners' deductions and the Prussin's credit. OPINION PSLC
On or about June 1, 1978, PSLC sold certain buildings and personalty to its wholly owned subsidiary, MORC. Pursuant to the terms of the purchase and sale agreement, MORC was to make a cash down payment of $ 500,000 and give PSLC a "wraparound" mortgage on the property in the amount of $ 4,700,000. At trial, PSLC admitted that respondent's use of the installment method in his computation of petitioner's corporate income tax deficiency was proper. [3] Respondent continues to maintain that because interest payments from MORC *480 exceeded 60 percent of PSLC's "adjusted ordinary gross income," PSLC is subject to the personal holding company tax imposed by section 541. The Internal Revenue Code imposes a special tax on the undistributed income of certain "personal holding companies." Section 541. [4] In 1934, and again in 1937, Congress concluded that many closely held corporations were no more than "incorporated pocketbooks." See Bittker and Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.20, p 8-39 (4th ed. 1979). Individuals had avoided the steeply graduated individual income tax by organizing corporations to hold investment securities. The government's principal means *481 of emptying such "incorporated pocketbooks," the accumulated earnings tax, was useless if a tax avoidance purpose could not be proven. The tax on personal holding companies was consequently designed to strike where the accumulated earnings tax could not. The tax is imposed on any corporation meeting certain mechanical standards of stock ownership and income. Section 542(a) sketches a profile of the "personal holding company": (a) General Rule. -- For purposes of this subtitle, the term "personal holding company" means any corporation * * * if -- (1) Adjusted ordinary gross income *482 requirement. -- At least 60 percent of its adjusted ordinary gross income (as defined in section 543(b)(2)) for the taxable year is personal holding company income (as defined in section 543(a)), and (2) Stock ownership requirement. -- At any time during the last half of the taxable year more than 50 percent in value of its outstanding stock is owned, directly or indirectly, by or for not more than 5 individuals. * * *
The parties have stipulated that only one shareholder owned PSLC stock during the corporation's taxable year ended May 31, 1979. Accordingly, they agree that the stock ownership requirement of section 542(a)(2) has been met. They also agree that interest earned pursuant to a purchase money mortgage must be included in the numerator of the fraction set forth in section 542(a)(1). Section 543(a)(1); see Lake Gerar Development Co. v. Commissioner,71 T.C. 887, 895 (1979). Where the parties differ is in the composition of that fraction's denominator. Section 543(b)(2) defines "adjusted ordinary gross income" as "ordinary gross income" subject to certain *483 reductions not petinent here. Section 543(b)(1)(A) defines "ordinary gross income" as gross income less "all gains from the sale or other disposition of capital assets." Respondent contends that PSLC's "ordinary gross income" does not encompass gain on the corporation's sale of the property to MORC. Because interest payable by MORC was PSLC's sole remaining type of income, respondent maintains that 100 percent of PSLC's "adjusted ordinary gross income" was "personal holding company income." Petitioner argues that respondent "effectively determined" that PSLC realized "ordinary gross income" of $ 778,938, as follows: Income (Gain) from sale of real estate
under the Installment Method
$ 464,069
Collection of interest on property
sold
314,869
Ordinary Gross Income
$ 778,938
Because PSLC's $ 314,869 of interest income is only 40 percent of the "ordinary gross income" allegedly determined by respondent, petitioner maintains that it is not a personal holding company and that it therefore is not subject to the tax imposed by section 541. Petitioner's argument is entirely unpersuasive. The notice of deficiency nowhere states that PSLC realized "ordinary *484 gross income," as that term is defined in section 543(b)(1), of $ 778,938. The notice of deficiency simply sets forth the following explanation for respondent's determination of PSLC's liability: Since over 60 percent of your adjusted ordinary gross income reported for the taxable year ending May 31, 1979 was from interest, you qualified as a personal holding company as defined by section 542 of the Internal Revenue Code. Therefore, you are subject to the personal holding company tax imposed by section 541 of the Code.
For purposes of section 542, "ordinary gross income" consists of gross income exclusive of capital gain, but for purposes of section 541, section 545(a) defines "undistributed personal holding company income" as simply "the taxable income of a personal holding company." Section 545(b)(5) permits a deduction for net capital gain, but not for short-term capital gain taxed at ordinary rates. See section 1.545-2(e), Income Tax Regs. Short-term capital gain is thus excluded from income when determining whether a corporation *485 is a personal holding company, but included in income when computing its "undistributed personal holding company income" subject to the tax. By including gain recognized on the sale of the property to MORC in PSLC's "undistributed personal holding company income," respondent did not "effectively determine" that PSLC realized "ordinary gross income" of $ 778,938. Petitioner also contends that respondent's characterization of Summit House as a capital asset is a new issue first raised in respondent's brief. This contention is without merit; respondent's determination of petitioner's personal holding company tax liability was predicated on a determination of petitioner's "ordinary gross income" pursuant to section 543(b)(1). It is thus petitioner, not respondent, who has raised the issue on brief. Had petitioner chosen to address the issue at trial, it might have submitted evidence demonstrating that the property was held or sold in the ordinary course of PSLC's trade or business. See section 1221(1). Absent such evidence, we cannot find that the property was not a capital asset. Rules 142(a) and 149(b). [5] Respondent's determination is sustained. *486 Prussin and Isaacson
Partnership Losses
Petitioners claimed deductions for their distributive shares of PSA's losses. In each of the years in issue, a substantial portion of PSA's reported expenses was attributable to deductions for depreciation and interest. To be deductible under section 167, depreciation must be based on an actual or bona fide investment in property. Odend'hal v. Commissioner,80 T.C. 588, 604 (1983), affd. 748 F.2d 908 (4th Cir. 1984). To be deductible under section 163, amounts paid as interest must be paid on genuine indebtedness. Knetsch v. United States,364 U.S. 361 (1960). If the purchase price and the principal amount of a nonrecourse note unreasonably exceed the value of the property, no "investment in the property" occurs and no "genuine indebtedness" exists. Estate of Franklin v. Commissioner,544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). We have on several *487 occasions applied the principle set forth in Estate of Franklin to disallow deductions for interest and exclude nonrecourse debt from the basis of encumbered property. Odend'hal v. Commissioner, supra;Houchins v. Commissioner,79 T.C. 570, 598 (1982); Siegel v. Commissioner,78 T.C. 659, 685 (1982); Brannen v. Commissioner,78 T.C. 471, 493 (1982), affd. 772 F.2d 695, 701 (11th Cir. 1984); Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982). On the basis of the entire record, we conclude that PSA's deductions for depreciation and interest must likewise be disallowed. Without these deductions, the partnership was not entitled to report a loss in any of the years in issue. In reaching our conclusion, we have attempted to determine the approximate fair market value of the property in early June 1978. Fair market value has been defined as the price at which property would change hands between a willing buyer and a willing seller, neither being *488 under any compulsion to buy or sell and both having reasonable knowledge of all relevant facts. United States v. Cartwright,411 U.S. 546, 511 (1973). This generally accepted definition of fair market value assumes that buyer and seller are separate and distinct entities having adverse economic interests. Narver v. Commissioner,75 T.C. at 96. Because fair market value is a question of fact, we have weighed all relevant evidence and have drawn appropriate inferences. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court. The purchase and sale documents in the three pertinent transactions appear to reflect an extraordinary increase in the property's value. On May 3, 1978, PSLC agreed to purchase Summit House, its underlying land, and associated personalty for $ 4,200,000. Documents recording the sale state that the purchase price of the land and buildings was $ 3,650,000. The personal property was sold for $ 550,000. Approximately 1 month later, PSLC sold Summit House and the personal property to MORC for $ 5,200,000. The building alone was then purportedly worth $ 3,681,000; *489 the price of the personal property had apparently risen to $ 1,519,000. Within hours, or even minutes, of PSLC's sale to MORC, PSA purportedly purchased MORC for $ 7,759,200. Several days later, MORC was liquidated into PSA. In Odend'hal v. Commissioner,80 T.C. at 612, we commented that "the doubling of the purchase price in such a back-to-back sale makes us question whether the second sales price reflects the fair market value, because there is nothing in the record to indicate how such a dramatic change could have occurred within a few weeks." A similar concern is appropriate in this case. Nothing in the record suggests that PSLC acquired the property in anything other than an arm's-length transaction. Although petitioners allege that Robbins was willing to dispose of the property for less than its fair market value, the record does not support their allegation. Petitioners maintain that the individuals represented by Robbins were disappointed by the performance of their investment and they insist that Robbins, allegedly an old friend of Blum's father, consequently *490 sold the property to PSLC at a bargain price. Petitioners' argument is based almost entirely upon the testimony of Edward H. Schwartz (Schwartz), a member of the group represented by Robbins. Schwartz did not address the fair market value of the property, and his testimony actually undermines petitioners' position. Although Schwartz described his group's investment in the property as a "bad experience," he admitted that the selling price of the apartment complex was based on the market value of its then-projected rent roll. Moreover, on cross examination, Schwartz admitted that he was satisfied with Robbins' representation of his interests. Although neither party submitted a competent appraisal, the record contains some evidence suggesting that Robbins sold the property to PSLC for no less than its fair market value. [6]Inferences of fair market value may, for example, be drawn from amounts of insurance coverage. Estate of Franklin v. Commissioner,544 F.2d at 1048 n.4. On November 7, 1978, PSLC and PSA refinanced the first mortgage on the property and its underlying *491 land by obtaining a loan from Equitable. Equitable required fire and extended coverage insurance in the amount of $ 2,745,000, with a 90 percent coinsurance clause. Because the required insurance protected the replacement value of the buildings, not the land, the dollar amount of insurance was not inconsistent with the price PSLC paid for the entire property. We consequently rest our decision on what has been described as the most reliable evidence of value, to wit, a sale of the same property shortly before the valuation date. See Chiu v. Commissioner,84 T.C. 722, 734 (1985). As we observed in Narver v. Commissioner,75 T.C. at 97: When two parties dealing at arm's length assign a certain value to property being *492 sold, and when that value has economic significance to each of the parties, the value assigned by the parties is very persuasive evidence of its fair market value. This evidence will be determinative of the actual fair market value in the absence of competent evidence to overcome it. [Emphasis supplied. Citations omitted.]
We conclude that only the first sale, i.e., the sale from Robbins to PSLC, provides evidence of the property's fair market value in early June. Petitioners have failed to adduce competent evidence sufficient to overcome the original sales price of the property. Sales subsequent to PSLC's acquisition of the property from Robbins were not at arm's length, and provide no evidence of the property's fair market value. PSLC and MORC, its wholly owned subsidiary, were not separate and distinct entities with adverse economic interests. There is no evidence in the record of any negotiations between PSA and PSLC, and no evidence suggests that the price PSA "paid" for MORC was justified or justifiable. Without dwelling on the many indicia of tax avoidance present in the record, suffice it to say that the preparation of documents with apparent disregard *493 for key dates, the relative absence of arm's-length dealing, and an unconcern for the actual economics of an allegedly substantial real estate "investment" all suggest that PSA's acquisition of Summit House was motivated by little more than a desire for tax benefits. PSA's offering memorandum explicitly states that the partnership was not intended to generate cash flow for distribution to its investors. Although the offering memorandum also states that prospective partners should expect to profit from appreciation, PSA proposed to "pay" $ 7,759,200 for property worth less than $ 4,200,000. Assuming that it was reasonable to expect the property to appreciate substantially, it was not reasonable to pay almost twice what the buildings were worth on the date of purchase. The memorandum and its accompanying schedules focus primarily, if not exclusively, on the tax advantages of investment in the partnership. These purported tax advantages, not the prospect of appreciation, were to be the partnership's reward for its acquisition of the property. As we noted in Flowers v. Commissioner,80 T.C. 914, 935 n.28 (1983), in a transaction entered into primarily to generate *494 tax benefits, the interests of the buying and the selling parties are not necessarily adverse. PSLC thus had no objection to any artificial inflation in the price of the property. Other evidence indicates that PSA agreed to "pay" a grossly inflated price because it did not intend to obtain an actual "investment" in the property. The parties have stipulated that the 1979 assessed value of the building was $ 1,096,200. In this case, the relationship between assessed value and fair market value has not been demonstrated. Northern Trust Co., Transferee v. Commissioner,87 T.C. 349, 382 (1986). We may nevertheless consider the offering memorandum's treatment of the assessed value of the property as evidence of the partnership's intentions. Assuming that the assessed value was only 72 percent of market value, the lower figure represented by PSA in the offering memorandum, the 1979 value of the building was only $ 1,522,500. The offering memorandum's implication of a low fair market value is consistent with our view of this transaction as a "paper trail" designed to yield deductions. See Falsetti v. Commissioner,85 T.C. 332, 347-348 (1985). *495 Finally, we note that in 1985, PSLC and PSA sold the land, buildings, and personal property to an unrelated third party for $ 7,000,000, of which $ 280,000 represented the sellers' real estate brokerage commission obligation. Although the property had appreciated substantially over a 7-year period, PSA clearly did not receive an amount equal to what it purports to have paid for the buildings and personal property alone. PSA's willingness to sell the property for such a low price suggests that the partnership did not consider its "investment" to be as substantial as it now claims. We thus conclude that the fair market value of the property could have been not more than $ 4,200,000 on the date of PSLC's sale of MORC to PSA. Because the land underlying the building and personal property must have had some value, the property purchased by PSA was almost certainly was worth less. PSA nevertheless claimed a depreciable basis in the property of $ 7,759,200. Of this amount, $ 7,259,200 represents nonrecourse financing. The record contains no evidence establishing that MORC's $ 500,000 cash down payment was actually made, and only a bald assertion by Schwartz suggests that payments *496 were made on the notes. The absence of documentary evidence of any payments is unexplained, and, from petitioners' failure to produce such evidence, we may infer that any documentation would not support petitioners' claim. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Applying the principle set forth in Estate of Franklin v. Commissioner, supra, and its progeny, we conclude that the principal amount of the indebtedness given or assumed by PSA, as well as the total purchase price "paid" by the partnership, unreasonably exceeded the value of the property. For tax purposes, no "investment in the property" occurred and no "genuine indebtedness" exists. PSA has not established any depreciable basis in the property, nor has it established the existence of any bona fide debt. The partnership is thus not entitled to deductions for depreciation or interest. Petitioners misconstrue the principle set forth in Estate of Franklin and applied above. They contend that we must compare the fair market value of the property with the present value of PSA's nonrecourse *497 note. In no case has this Court or any other court adopted the test advanced by petitioners.[7] Petitioners rely on Gyro Engineering Corp. v. United States,417 F.2d 437 (9th Cir. 1969); Waddell v. Commissioner,86 T.C. 848 (1986); and Brountas v. Commissioner,73 T.C. 491 (1979), vacated and remanded on other grounds 692 F.2d 152 (1st Cir. 1982), affd. in part and revd. and remanded in part on other grounds sub nom. CRC Corp. v. Commissioner,693 F.2d 281 (3d Cir. 1982), to argue that the approach set forth in Estate of Franklin has been reformulated. Gyro Engineering Corp. v. United States, supra, cannot in any way be construed as authority for petitioners' position. In Waddell v. Commissioner, supra, we explicitly recognized that the Estate of Franklin test is applied by "comparing the value of the encumbered property to the total purchase price and the principal amount of the putative debt." 86 T.C. at 903. We also observed, however, that *498 the property securing the debt at issue in Waddell consisted of computer equipment and related intangibles that, unlike real estate, were expected to decline in value over time. See 86 T.C. at 907 n. 39. Moreover, any payments of principal on the debt were to be made out of net exploitation revenues from the taxpayer's use of the property. Because equivalence between the value of the property and the face amount of the debt would not necessarily continue to exist throughout the life of each, we expanded the equivalence inquiry to encompass default or maturity. 86 T.C. at 903-904. In Brountas v. Commissioner, supra, we merely determined that certain nonrecourse notes were production payments under section 636. *499 Investment Tax Credit
Petitioners Prussin claimed an investment tax credit on their 1978 tax return for an amount attributable to PSA. Petitioners presented neither evidence nor argument pertaining to their entitlement to the credit. We deem the matter conceded. Rules 142(a) and 149(b).
Additions to Tax
Section 6621(c), formerly section 6621(d), provides for an increase in the rate of interest accruing on tax deficiencies where there is a "substantial underpayment" (an underpayment exceeding $ 1,000) in any taxable year attributable to tax motivated transactions. Section 6621(c)(1) and (2). Section 6621(c)(3)(A)(i) provides that "any valuation overstatement (within the meaning of section 6659(c))" is a "tax motivated transaction." Section 6659(c) defines as a valuation overstatement a claim that the value or adjusted basis of property is at least 150 percent of the actual value or adjusted basis. Because the basis determined herein is zero, the entire amount of PSA's claim of a depreciable basis of $ 7,759,200 constitutes a valuation overstatement under section *500 6659(c). Because petitioners' underpayments exceeded $ 1,000, and because the underpayments were attributable to a tax-motivated transaction, petitioners are liable for the increased rate of interest. We have considered each of the other arguments advanced by the parties, but do not address them here because they are unnecessary for our resolution of the issues presented. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of Melvin W. Isaacson, Miriam A. Isaacson, Executrix, and Miriam A. Isaacson, docket No. 23782-85; and George Prussin and Sharon Prussin, docket No. 28283-85. ↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
3. In its brief, petitioner contends that respondent erroneously failed to reduce PSLC's gain by commissions paid of $ 78,677. Petitioner is incorrect. On its return, PSLC accounted for these commission in its computation of the corporation's "Deferred Gain on Sale of Property"; respondent simply determined that this gain must be reported under the installment method, rather than under the "cost recovery" method. ↩
4. SEC. 541. IMPOSITION OF PERSONAL HOLDING COMPANY TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542↩) a personal holding company tax equal to 70 percent of the undistributed personal holding company income. 5. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure. ↩
6. Petitioners failed to submit an expert report as required by Rule 143(f)↩ and the Standing Pretrial Order, and before trial they decided to proceed without expert testimony as to value. At trial, petitioners submitted an appraisal prepared for Blum. That appraisal was neither offered nor received as proof of fair market value. 7. In Brannen v. Commissioner,78 T.C. 471 (1982), affd. 772 F.2d 695 (11th Cir. 1984), we stated that the test was whether the stated purchase price unreasonably exceeded the value of the property. In Hager v. Commissioner,76 T.C. 759 (1981), we stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. In this case, as in other cases, we need not decide which test is appropriate because our decision would be the same under either approach. See Waddell v. Commissioner,86 T.C. 848, 901 n.34 (1986); Flowers v. Commissioner,80 T.C. 914, 942 n.42 (1983); Odend'hal v. Commissioner,80 T.C. 588, 604 n.7 (1983), affd. 748 F.2d 908 (4th Cir. 1984). Were we to adopt petitioners' approach we would nevertheless conclude that the deductions in issue were properly disallowed. On brief, petitioners adduce lengthy charts that purportedly compare the present value of PSA's obligation with the fair market value of the property. We are at a loss to understand the intended significance of petitioners' display. Petitioners compute a present value of $ 4,679,655 for the notes, yet fail to explain why PSA is nevertheless entitled to include the full face value of the notes in its basis. Moreover, petitioners' analysis is flawed in several other respects. Petitioners' computations are based on assumptions without foundation in the record, and many entries in petitioners' charts do not correspond with the exhibits from which they were allegedly derived. Statements in a brief do not constitute evidence; we may not accept as fact assumptions that are without evidentiary support. See Rule 143(b)↩.