GEORGE PRUSSIN AND SHARON PRUSSIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Prussin v. Commissioner
Docket No. 28283-85
United States Tax Court
T.C. Memo 1990-287; 1990 Tax Ct. Memo LEXIS 305; 59 T.C.M. (CCH) 828; T.C.M. (RIA) 90287; June 11, 1990, Filed *305 Decision will be entered under Rule 155. Richard S. Kestenbaum and Bernard S. Mark, for the petitioners. Leslie J. Spiegel, for the respondent. COHEN, Judge. COHEN
SUPPLEMENTAL MEMORANDUM OPINION This case has been remanded for proceedings consistent with the opinion of the Court of Appeals for the Third Circuit in Pleasant Summit Land Corp., et al. v. Commissioner, 863 F.2d 263 (3d Cir. 1988), affg. in part and revg. in part T.C. Memo. 1987-469. Detailed findings of fact are set forth in our prior opinion and in the opinion of the Court of Appeals. *306 Briefly, petitioner George Prussin was a limited partner in Pleasant & Summit Associates (PSA), a New Jersey limited partnership. On June 14, 1978, PSA purchased an apartment building known as Summit House (the property), but not the land on which it stood, from Pleasant Summit Land Corporation (PSLC). On its partnership returns for 1978 and 1979, PSA claimed a depreciable basis of $ 7,759,200 in the property, of which $ 7,259,200 represented nonrecourse financing. On its partnership returns for 1978 and 1979, PSA reported losses, a substantial portion of which was attributable to deductions for depreciation on the apartment building and interest on the nonrecourse debt. The reported interest expense was accrued but remained unpaid. On their 1978 and 1979 joint income tax returns, petitioners deducted George Prussin's distributive share of PSA's 1978 and 1979 losses. In our prior opinion, T.C. Memo. 1987-469, we concluded that the fair market value of the apartment building at the time of PSA's acquisition was not more than $ 4,200,000 (the price paid by PSLC in an arm's-length transaction for the apartment building and the land); that the nonrecourse debt was not *307 genuine indebtedness; and that petitioners did not acquire an interest in the property that would entitle them to depreciation deductions. Our opinion was affirmed by the Court of Appeals for the Second Circuit in Estate of Isaacson v. Commissioner, 860 F.2d 55 (2d Cir. 1988). The Court of Appeals for the Third Circuit remanded this case "for a determination of the fair market value of Summit House, the actual cash investment, if any, made by PSA for the purchase of Summit House, and for further proceedings consistent with this opinion which will partially allow the interest and depreciation deductions claimed by them." 863 F.2d at 277. The parties have now agreed that the fair market value of the depreciable property acquired by PSA is $ 3,747,675. The parties have also stipulated that $ 500,000, representing a down payment on the property, was paid as follows: Date
Check No.
Amount
6/14/78
1001
$ 200,000
8/30/78
1012
166,000
9/26/78
1015
19,000
9/27/78
1017
33,000
11/22/78
1020
82,000
TOTAL
$ 500,000
Although these amounts were not paid on the date of sale, respondent has agreed to treat *308 all five payments as part of the down payment provided for in the sale documents. On remand, petitioners contend that this Court has been instructed by the Court of Appeals for the Third Circuit to treat the cash plus the fair market value of the property as the depreciable basis and to allow the deductions for depreciation and interest pro rata, to wit, in the ratio that $ 4,247,675 bears to $ 7,759,200 (the original basis claimed). Respondent contends that we must address issues not addressed in our original Memorandum Findings of Fact and Opinion because they were made unnecessary by our resolution of the issues. Respondent first argues that we should disallow deductions to the extent that they exceed income, applying section 183, Internal Revenue Code, as amended and in effect for the years in issue, because neither we nor the Court of Appeals previously addressed the arguments made on that issue in this Court. Respondent also argues that, in any event, we must determine whether the method of depreciation used by PSA was appropriate and whether the rate of interest used by PSA was appropriate in determining the amount of deductions to be allowed on *309 remand. With respect to respondent's first argument, we do not believe that we are now free to apply section 183 to deny petitioners' deductions. On appeal, petitioners contended, among other things, that total disallowance of deductions was an unconstitutional denial of due process. The Court of Appeals stated: Unquestionably, the record compels the conclusion that Summit House, though not exceeding $ 4,200,000 in fair market value, had a substantial value. Thus, under our analysis the Tax Court's determination that the deductions should be disallowed in full cannot be sustained. Accordingly, we will remand the case to the Tax Court for a determination of fair market value of Summit House at the time of PSA's acquisition. [Fn. ref. omitted.] * * * The Prussins' constitutional challenge is based on a contention that they were denied due process of law by the total disallowance of the deductions. Thus, they do not assert that the result we reach would deny them due process of law. Accordingly, their constitutional argument is moot and will not be considered. [863 F.2d at 277.]
The Court of Appeals agreed with our factual analysis of *310 the economics of the transaction. Under these circumstances, we are constrained to determine the amount of interest and depreciation to which petitioners are entitled, without regard to income generated by the property. The Court of Appeals has, in effect, directed us to allow deductions based on the value of the property regardless of PSA's profit objective or lack of it. The parties have asked us to draw our conclusions as to the depreciation method and interest rate on the arguments in the briefs they filed at the conclusion of the trial. Preliminarily, however, we must decide the amount to be considered basis in the building. Basis
Petitioners contend that their depreciation deductions are to be based on a total of $ 4,247,675, the sum of the cash down payment and the fair market value of the apartment building, because of the following language from the conclusion to the opinion of the Court of Appeals: We also hold that PSA's nonrecourse debt did not support interest and depreciation deductions to the extent it exceeded the sum of the cash investment of PSA in Summit House and the fair market value of Summit House at the time of its purchase. * * * [863 F.2d at 277.] *311 That statement in the opinion of the Court of Appeals immediately preceded the language of remand quoted at page 3, supra. The discussion in the opinion leading to this conclusion is as follows: While we realize that a taxpayer holding property subject to a nonrecourse debt in excess of the market value of the property may have no incentive to pay off any portion of the debt, including the amount not exceeding the fair market value of the property, it is equally logical to recognize that the creditor holding the debt has no incentive to take back the property if the taxpayer offers to pay the debt up to the value of the property. For example, if a creditor held a nonrecourse debt for $ 1,500,000 on a property with a fair market value of $ 1,000,000, he would have a disincentive to foreclose if his defaulting debtor offered to settle the debt for not less than $ 1,000,000. Thus, it is appropriate to disregard only the portion of nonrecourse debt in excess of the fair market value of the property when it was acquired for purposes of calculations of the depreciation *312 and interest deductions and to regard the nonrecourse debt as genuine indebtedness to the extent it is not disregarded. Moreover, there is precedent for disallowing deductions based on nonrecourse debt only insofar as attributable to the excess of debt over the fair market value. [Citation omitted.] * * * We also conclude that the actual cash investment of PSA in the purchase of Summit House, if there was any, should be disregarded in the calculation of the fair market value as it obviously was at risk. * * * The significance of the cash investment is that there is an economic reason to pay off a nonrecourse debt when there is some equity in the property, even though the total debt when added to the equity exceeds the value of the property, as the alternative to paying the debt is the loss of the equity. Thus, if there is a $ 500,000 equity in a property worth $ 4,000,000, the owner of the property should logically be willing to pay off up to $ 4,000,000 in nonrecourse debt to save the property because his loss in that case will not exceed $ 500,000 but his loss in giving up the property will be $ 500,000. [863 F.2d at 276-277.]
Thus the *313 language of the Court of Appeals is accompanied by a rationale, i.e., "there is an economic reason to pay off a nonrecourse debt when there is some equity in the property, even though the total debt when added to the equity exceeds the value of the property, as the alternative to paying the debt is the loss of the equity." (Emphasis added.) Generally, of course, the basis of property for depreciation purposes is cost. An exception to the general rule has been applied where "peculiar circumstances" surround the transaction and the purchaser agrees to a price in excess of fair market value. Bryant v. Commissioner, 790 F.2d 1463, 1466-1467 (9th Cir. 1986), affg. a Memorandum Opinion of this Court; Lemmen v. Commissioner, 77 T.C. 1326, 1347-1350 (1981); Bixby v. Commissioner, 58 T.C. 757, 776 (1972).If we had concluded in our prior opinion that petitioners had acquired an investment in the property, we would have applied the "peculiar circumstances" *314 rule based on the non-arm's-length aspects of the transaction and the incentive to inflate the purchase price to secure tax benefits. In their reply brief in this case, petitioners stated: Assuming, arguendo, that the Court should determine that the fair market value of the Property acquired by the Partnership is less than the stated consideration paid therefor, then in such event, Petitioners should be entitled to utilize the amount so determined as the basis for depreciation. Cooper v. Commissioner, 88 T.C. 84, 110-111 (1987).Similarly, this Court should determine that the present value of the debt should constitute the consideration paid. * * *
The Court of Appeals, however, has concluded that the depreciation must be computed on a basis of the fair market value of the property plus the cash paid, a total of $ 4,247,675. Method of Depreciation
PSA reported depreciation on the component method, although the acquisition documents did not allocate costs among components of the apartment building. As evidence of the correctness of their depreciation deduction, petitioners rely solely on the testimony of Edward H. Schwartz (Schwartz), *315 who once had a 15 percent interest in the property and was involved in the construction of the apartment building in 1972. Respondent argues that entitlement to component depreciation is predicated upon a showing that the values and useful lives assigned to each of the components are reasonable and proper. Shainberg v. Commissioner, 33 T.C. 241, 254 (1959).See also Pohlen v. Commissioner, 165 F.2d 258, 259 (5th Cir. 1948). Because the dispute between the parties may be reduced to whether Schwartz's testimony was sufficient to sustain petitioners' burden of proof, we quote at length that testimony from the trial on October 8, 1986. On direct examination by petitioners' counsel, Schwartz testified: Q Do you recall in what years you had an ownership interest in the property? A I believe from about 1972 on. Q When until when, do you recall? A Until the property was sold in '76, I guess it was, '77. I had an ownership interest in the property all the years it's been there, until such time as it was sold. Q To ultimately Pleasant Summit Associates? *316 A Yes. Q Just for the record, Mr. Schwartz, that occurred in 1978. A '78. * * * Q Were you responsible for any of the construction aspects of the project? A Yes, I was. I was also a stockholder in the construction company. Q Can you tell me specifically what roles you had with respect to the construction of the building? A I was very much involved in the design and the specifications of what went into the building. Almost on a total basis. Q You fully designed the specifications? A I pretty much prepared most of the specifications subject to conversation with some of my partners.
The balance of Schwartz's testimony on direct examination was related to sale of the apartment building. On redirect, he testified as follows: Q At the time of the construction of the Summit Apartments, were you familiar with the costs attendant to constructing that facility? A Yes. Q Were you familiar at that time with components that made up the physical entity? A Without question. Q Do you have any independent recollection, present recollection, with respect to the components and/or the costs that make up the Summit Apartments? A Are you talking about *317 on a line by line basis? Q Right. A I am taxing my memory, but I think I'm reasonably familiar. * * * Q Mr. Schwartz, can you specifically recall the amounts of costs necessary to construct the components of the Summit House at this time? A Specifically? You mean down to the line by line items? No; I couldn't do that. * * * Q * * * do you know the components making up the Summit House Apartments and can you approximate the costs of construction of those components? A If you are asking me whether I can do it, my answer is yes. Another hat I wear, I am a builder. Could I sit down and budget out the entire breakdown of Summit House Apartments? Yes. Can I do it off the top of my head without using mathematics; it would be difficult. Q Can you delineate for the Court today the items making up the components of the Summit House? A Yes. Q Would you so delineate those items? A Let's talk about raw construction of buildings only, we are starting with a footing; a foundation. We are talking about the perimeter walls; concrete floor poured on the first floor in one building. Concrete and concrete plank in the second building. Steel studs for the partitioning inside *318 the building of the individual apartments. Sheetrock walls; carpeted floors; electric panel in every apartment; washer/dryer hook-ups in the buildings; elevators; floor tile, no-wax linoleum in the kitchens; medicine cabinets; grab rails; towel bars; door hardware; metal doors and bucks; roofing; mansard roof on the perimeter of the buildings, which is wood frame; garbage compactor rooms; garbage chutes; a swimming pool; underground utilities to the extent of sewer, water, electric; paved parking areas; curbing; sidewalks; exterior lighting; interior hallway lighting; dropped ceilings in the hallway on an acoustic grid; water stand by pipes for fire hoses in the stair wells; painting; spray painting of popcorn on the concrete plank ceilings of the apartments; boiler rooms; hot water baseboard heat; pressurized ventilation system. I don't think I left much out, if I did. That is pretty much the building.
* * * Q Mr. Schwartz, are you capable of breaking down the components that you just delineated into what percentage -- as to what percentage they make up the total physical premises? A That's difficult to do because the amenities you put into the building will *319 distort those percentages. * * * It's hard to break out the percentages because they are distorted. * * * * * * Q Rather than attempt to break it down on a percentage basis, can you delineate the specific costs of construction or specific costs of the components with respect to the Summit House? A I can give you component costs to the extent that -- as an example, paving, more or less $ 9.00 a square yard, give or take, depending on how busy your contractor is, that is what you would buy it for. Plumbing, as I said, typically, at that point in time it was around $ 500 a fixture. A typical -- the type of appliances that were used in Summit House, the double oven and range, which was all GE at that time, was in excess of $ 900. A dishwasher was $ 175. A refrigerator was $ 200. Painting was $ 0.20 a square foot. Concrete plank at that point in time was probably about $ 0.40 a square foot. Brick was about $ 6.00 a square foot. Block was about $ 3.50 a square foot. We have to break down a building by its component parts specifically on that building. I would not use percentages.
Q Do you have a recollection as to the total construction cost of the Summit *320 House, hard costs? A Summit House, on a hard cost basis at that time, to the best of my recollection, was somewhere between $ 3.5 and $ 4 million. I don't remember exact numbers. It was between $ 3.5 and $ 4 million. Q Starting with the items you specifically delineated, can you give a cost breakdown as total component -- a component cost breakdown for Summit House at this time, on an item by item basis, making up the $ 3.5 to $ 4 million? A Could I spell it out and break down what those costs are on an individual basis? Q Yes. A Off the top of my head, it would be awfully difficult. It would be difficult for me. Probably if I was able to think it through, yes. It would be awfully difficult extemporaneously for me to do that. Q Why don't we attempt to give it a shot? Schwartz then speculated at the cost of various items, such as linoleum floor and carpeting, room by room, price per square foot, and estimating based on the number of apartments in the apartment building. On cross-examination, Schwartz testified as follows: Q Since 1976, have you been involved in the construction of any other residential buildings? * * * A Somewhere, 1500, 2000, somewhere *321 in that range. Q Do you specifically recall the cost of each item in each building? A Not really. Q Were the costs that you recited in response to Mr. Mark's questions exact or approximate costs for the component parts of the buildings? A No, approximate. I have no way of doing it exactly, sitting here.
In their brief, petitioners attempt to reconstruct the component costs of the apartment building using Schwartz's estimates. We conclude, however, that Schwartz's testimony on its face was speculative, unreliable, and insufficient to satisfy petitioners' burden of proof. PSA's depreciation deduction, therefore, must be based on the composite apartment building. In the statutory notice of deficiency sent to petitioners, respondent set forth a determination with respect to depreciation, made in the alternative to total disallowance. That determination was as follows: The claimed partnership depreciation deductions of $ 1,034,919.00 and $ 737,916.00 as shown on your returns for the tax years ended December 31, 1978 and December 31, 1979, respectively, are disallowed to the extent of $ 947,402.00 for 1978 and $ 653,134.00 for 1979 because it has not been *322 established that any more than $ 87,517.00 for 1978 and $ 84,782.00 for 1979 represents a reasonable allowance for depreciation deductible under section 167 of the Internal Revenue Code of 1954 or is otherwise deductible under any other applicable provision of the Internal Revenue Code of 1954.
Petitioners have not presented evidence sufficient to allow any more depreciation than the amount thus determined by respondent, using the method applied by respondent. The deduction to the partnership for depreciation will thus be computed at the rate allowed by respondent applied to a depreciable basis of $ 4,247,675, and that amount will be taken into account in determining petitioners' distributable share of the partnership income. Interest
The Court of Appeals concluded that the nonrecourse financing for purchase of the apartment building should be treated as genuine indebtedness to the extent of the fair market value of the building. On remand, we were directed to allow partially the interest claimed by petitioners. The interest expense accrued by the partnership has not been explained in the record. The mortgage notes provided *323 for interest at rates ranging from 6 to 9 percent, depending on the excess of cash flow over certain expenses of the property. The accrued interest claimed, however, was equivalent to rates ranging from 6 percent to 39.3 percent per annum. This effect resulted from lump-sum payments required under various documents and not from application of a specified interest rate to the principal amount owing. Respondent, of course, has argued that no interest should be allowed because the notes do not represent bona fide indebtedness. In his brief, however, he acknowledges: Should the Court determine that some portion of the nonrecourse financing is legitimate and some deduction for interest is permissible, a reasonable interest rate must be determined and applied.
Respondent then calculates "an effective economic interest rate for both the $ 4,700,000 and $ 2,559,200 notes of nine percent." In support of this interest rate, respondent points out that the rate established by Equitable Life Assurance Society of the United States, an independent third-party lender, for a loan given in November 1978 was 9-3/8 percent. Petitioners do not dispute that the effective rate *324 of interest on the notes is 9 percent. Petitioners' brief contains a chart that reflects "a true overall interest rate of less than nine (9%) percent." Apparently petitioners now believe that the amount of interest allowed should be calculated by applying to the amount originally claimed the percentage of the debt now to be recognized to the face amount of the debt. In directing us to recognize the validity of the debt to the extent of fair market value, the Court of Appeals was obviously concerned with reality. Reality in this instance reflects a 9-percent per annum interest rate. Thus the interest deductible to the partnership and includable in the loss distributable to the partners should be computed at 9 percent per annum, without regard to lump sum payments of interest set out in the documents. In order to give effect to this opinion, Decision will be entered under Rule 155.