REGENTS PARK PARTNERS, THE CLINTON COMPANY OF ILLINOIS, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Regents Park Partners
Docket Nos. 3545-90, 10395-90
United States Tax Court
T.C. Memo 1992-336; 1992 Tax Ct. Memo LEXIS 357; 63 T.C.M. (CCH) 3131; June 11, 1992, Filed *357 Decisions will be entered under Rule 155. Scott Greiner and Theodore Gelt, for petitioner. Steven S. Brown, for participants Harvey M. Silets and Royal B. Martin, Jr.
Harvey M. Silets (participant), pro se. Bruce Anderson, for respondent. Korner
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: By Notices of Final Partnership Administrative Adjustment (FPAA) dated November 30, 1989, December 20, 1989, and May 11, 1990, respondent increased Regents Park Partners' (the partnership) ordinary income for 1984, 1985, and 1986 in the amounts of $ 2,833,078, $ 2,318,212, and $ 1,616,806, respectively. In addition, respondent disallowed certain other deductions and credits. Following concessions, the remaining issues for decision are: (1) Whether the acquisition of certain real property by the partnership constituted a sham transaction; (2) whether the partnership acquired the benefits and burdens of ownership of the real property, located in Chicago, Illinois, in January 1981, and therefore is entitled to ordinary losses arising from the operation of the improvements situated thereon; (3) whether the nonrecourse debt, to which the property was subject at the time of *358 acquisition, unreasonably exceeded the fair market value of the property, and must be excluded in determining the partnership's basis in the property; (4) whether, if the partnership had acquired the property, for purposes of Federal income taxation, the partnership was allowed to increase the basis of the real property by $ 828,361, which represented the amount the mortgagee of the property paid in 1981 for the 1980 real estate taxes on the property; (5) whether the partners' bases in their interests in the partnership are overstated; and (6) whether we have jurisdiction to determine that a partner, upon the sale or exchange of an interest in the partnership, must treat as ordinary income that portion of the gain derived from the excess depreciation attributable to the property's overvaluation. FINDINGS OF FACT The stipulation of facts, supplemental stipulation of facts, and their accompanying exhibits, to the extent the stipulations and exhibits were not excluded at trial, are incorporated herein by this reference. Regents Park Partners is a limited partnership organized under the law of the State of Illinois and has its principal place of business in Chicago, Illinois. The *359 following chart shows the partners of the partnership and their respective interests therein: The Summit
71.5%
(Limited Partner)
Frank DiMaria
5.0%
(Limited Partner)
Harvey M. Silets
4.5%
(Limited Partner)
Royal B. Martin, Jr.
.5%
(Limited Partner)
The Clinton Company of Delaware
7.0%
(Limited Partner)
Bruce E. Clinton
3.0%
(Limited Partner)
The Holding Company
7.5%
(Limited Partner)
The Clinton Company of Illinois
1.0%
(General Partner)
The Clinton Company of Illinois, petitioner, is an Illinois corporation, is the partnership's tax matters partner, and had its principal office in Chicago, Illinois, at the time the petitions in this case were filed. The partnership maintained its books and records according to the accrual method of accounting, and filed its Federal income tax returns on the basis of the calendar year. Background
This case involves the tax aspects arising out of the partnership's acquisition of two interconnected high-rise residential towers and the land upon which they stand, one located at 5050 South Lake Shore Drive, Chicago, Illinois (South Property), and the second located at 5020 South Lake Shore Drive, Chicago, Illinois (North *360 Property). The South Property and North Property shall be referred to collectively as the property. The property consists of approximately 3.135 acres (136,582 square feet) of land, and is located in an area of Chicago commonly known as Hyde Park. On the North Property is a 35-story apartment building with 528 units, and on the South Property a similar building of 36 stories and 510 units. A four-level underground garage with space for approximately 750 cars is also located beneath the apartment buildings. The buildings were constructed in the early 1970s. Respectively, the South Property and the North Property were originally owned by Chicago Beach South Towers, an Illinois limited partnership, and Chicago Beach North Towers, also an Illinois limited partnership. [1]
To finance construction of the properties, Chicago Beach South Towers and Chicago Beach North Towers in June 1970 entered into separate *361 though essentially similar trust agreements, Trust Number 40910 and Trust Number 40920, with LaSalle National Bank (LaSalle), a national banking association. According to the terms of the two trust documents, each of which established an "Illinois Land Trust", [2]LaSalle served as sole trustee and each of the limited partnerships was the sole beneficiary of the trust it created. Under the terms of each trust, the trustee was authorized to execute and deliver such agreements, contracts, notes, mortgages, trust deeds, certificates and other documents, including particularly the Federal Housing Administration ("FHA") Regulatory Agreement relating to the trust property * * * and any amendments thereto * * * and a mortgage on the trust property all as directed in writing by the beneficiary. On July 1, 1970, to finance construction on the South Property, *362 LaSalle as trustee obtained a $ 12,644,000 loan ($ 12.6 million loan) from McElvain-Reynolds Company in exchange for a nonrecourse note in like amount secured by a mortgage on the property. On the same date, the U.S. Department of Housing and Urban Development (HUD) agreed to insure the South Property loan pursuant to section 220 of the National Housing Act, and entered into a Regulatory Agreement for Multi-Family Housing Projects with LaSalle with respect to the South Property. Financing for construction of a high-rise apartment building on the North Property was obtained on May 1, 1972. LaSalle, as trustee, borrowed $ 13,472,700 ($ 13.4 million loan) from McElvain-Reynolds Company for which LaSalle executed a nonrecourse note secured by a mortgage on the North Property. On the same date, HUD insured the mortgage and executed a Regulatory Agreement for Multi-Family Housing Projects regarding the North Property with LaSalle, similar to that respecting the South Property. The regulatory agreements with HUD provided, in particular, that the owner of the property was required to make all payments due under the note and mortgage; could not, without prior written approval of HUD, *363 assign or transfer any beneficial interest in a trust holding title to the property; and was required to maintain the property in good repair and condition. The note attributable to the $ 12.6 million loan accrued interest at the rate of 8.5 percent per annum, with interest only payable for 30 months, and principal and interest of $ 96,692.42 payable for the next 479 months with final payment due on December 1, 2012. The note could be prepaid. According to the terms of the mortgage, the mortgagor was required to keep the property insured against loss in an amount not less than the lesser of 80 percent of the insurable value of the property or the unpaid balance of the insured mortgage, and was required to pay the mortgagee an amount sufficient to pay all taxes and special assessments levied against the property. The note for the $ 13.4 million loan accrued interest at a rate of 7 percent per annum, with interest payable only for 26 months and payment of $ 83,723.58 for 480 months with any unpaid amount of principal or interest due on July 1, 2014. Otherwise, the terms of the mortgage and note with respect to the $ 13.4-million loan were essentially the same as the mortgage and *364 note for the $ 12.6 million loan. McElvain-Reynolds subsequently sold the two mortgages and mortgage notes. Shortly after the completion of construction of the apartment buildings, the Developer defaulted on the notes. HUD paid off the notes and, as a consequence, became the mortgagee of the property. On or about October 28, 1975, the Developer surrendered possession of the property to HUD. Pursuant to a bidding process, petitioner was awarded the property's temporary management contract. Petitioner was awarded the permanent management contract for the property in January 1976; its fee was 4.75 percent of the gross rental collections. After winning the management contract, petitioner negotiated with HUD and the Developer to acquire the property. Occupancy of the apartment buildings in late 1975 was 48 percent of capacity and the property was in an operationally and physically disastrous condition, to the point that the city of Chicago was threatening to raze the structures. The neighborhood and the city of Chicago complained that some of the tenants, in particular drug dealers and prostitutes, had infested the building and affected the reputation of the surrounding community. *365 Structurally, the buildings suffered from a condition known as "spalling", which caused concrete to peel completely away from the internal framework. Spalling apparently arises from the use of improperly mixed concrete and the addition of excessive salt to the mixture to aid in winter pouring. The original contractor repaired the concrete in the mid-1970's and was released from liability by HUD, but the spalling later reappeared. In 1979, a report prepared for HUD determined that the problem, after it had reoccurred, could be fixed by a one-time expenditure of around $ 300,000. In 1985, a structural engineer determined that there was an inherent defect in the concrete, the maintenance of which would require an annual expense of $ 300,000. Petitioner was not aware of the extent of the spalling problem, as indicated by the structural engineering report issued in 1985, at any time prior to acquiring the property in January 1981. The property also had some water leaks in the foundations, roofs, and windows. During the summer of 1976, HUD instituted foreclosure proceedings in the Federal District Court for the Northern District of Illinois (District Court) against the Developer. *366 Petitioner submitted a proposal to HUD to acquire the property on or about September 17, 1976. On or about December 15, 1976, the Developer agreed to transfer the property to petitioner, if petitioner would submit a proposal to HUD to work out the mortgage deficiencies, would obtain HUD's approval of a transfer of deed to the properties, and would use its best efforts to have the trusts and its beneficiaries released from any liability. HUD rejected petitioner's workout proposal, and petitioner, along with Shannon & Associates (Shannon), successfully intervened in the foreclosure action on or about March 13, 1978. On or about October 2, 1978, the property was appraised at $ 17,500,000; however, no evidence was introduced showing how this value was derived. Shannon offered $ 10,150,000 for the notes on or about December 15, 1978, which offer HUD rejected. On or about February 28, 1979, Shannon offered $ 17,650,000 for the property, which offer was matched by petitioner, but HUD, as with all earlier proposals, rejected the offers. In the foreclosure action, the District Court indicated that it would not allow HUD to foreclose on the property, and HUD, as a consequence, was required *367 to put the property out for bid, but only to the two intervenors, petitioner and Shannon. This differed from HUD's usual procedure, which involved foreclosing on a property and then selling it on the market. Transfer of the Property
On July 21, 1980, HUD solicited proposals from both intervenors for the property's acquisition. The solicitation laid out minimum terms for any bid and these included a cash payment of $ 250,000 to be applied to the interest in arrears; the establishment of a repair escrow account of $ 505,000; a monthly payment for 60 months equal to the greater of the net cash on hand at the end of the preceding month or the sum of the service charges, tax accruals, and two-thirds of the mortgage interest requirement (with unpaid interest to accrue during that period); an amendment to the mortgage notes prohibiting prepayment without prior HUD approval; selection of an acceptable property manager; monthly cash accountings; submission of a comprehensive management plan; completion of certain repairs to the property; and a management fee not to exceed 4.75 percent of gross rental collections. Acceptance of a bid was conditioned on its approval by the U.S. Department *368 of Justice and the District Court, and the partnership's acquisition of title to the property. Furthermore, any resulting agreement would run for 60 months, with further negotiations envisioned following its expiration, concerning the long-term debt. On August 21, 1980, petitioner submitted its workout proposal to acquire the property. The proposal accepted HUD's minimum terms. In addition it offered to fund the repair escrow account up to a total of $ 3,255,000 based upon a repair program to be submitted to HUD. The prepayment requirement was accepted, and the proposal stated that it was a "virtual certainty that * * * [the property] will remain a rental project for the remaining term of the existing mortgages." On or about September 16, 1980, following clarification of petitioner's terms regarding the repair escrow account, petitioner was advised by the United States Attorney for the Northern District of Illinois (U.S. attorney) that HUD had recommended acceptance of petitioner's workout proposal subject to petitioner's obtaining title to the property. The agreement is hereinafter referred to as the provisional workout agreement (PWA). During the negotiations leading up *369 to HUD's acceptance of its workout proposal, petitioner had unsuccessfully attempted to reduce the amount of indebtedness to which the property was subject. Petitioner was stymied in its efforts, since HUD defined the fair market value of the property as the amount of its outstanding indebtedness, and maintained that it was legally prevented from reducing this amount. Regents Park South Partners and Regents Park North Partners, two divisions of the partnership, each entered into an agreement on October 3, 1980, with the Developer to acquire title to the South Property and North Property, respectively. According to the agreements, each property would be transferred outright on January 2, 1981. The Developer subsequently agreed to transfer its beneficial interest in the trusts in lieu of transferring title to the properties. In documents dated January 5, 1981, the Developer assigned its interest in Trust 40910 and Trust 40920 to Regents Park South Partners and Regents Park North Partners, respectively. Personality located on each property was conveyed by a Bill of Sale also dated January 5, 1981, to each transferee. HUD approved the assignment of the interests in the trusts and, *370 on or about January 6, 1981, authorized LaSalle to transfer those interests. Based upon the aforementioned events, the District Court entered an order dated January 7, 1981, granting HUD's motion to dismiss the foreclosure action without prejudice with leave to reinstate within 1 year. In January of 1981, the property still had some structural and maintenance problems, but it had achieved 96-percent occupancy. Prior to 1981, rental income from the property was not enough to provide for the repayment of the mortgages including the accrued interest, but income did exceed expenses. Petitioner did not obtain an independent appraisal of the property on or before January 6, 1981. Although no sales price was specifically mentioned in the transfer of the property to the partnership, the total amount of the outstanding indebtedness to which the property was subject (including the 1980 real property tax) as of January 6, 1981, was $ 37,025,452. [3]
*371 Normally HUD conducts a process called Transfer of Physical Assets (TPA) prior to the transfer of titles, which process is undertaken to determine whether the new owner meets HUD's criteria. However, since petitioner had already received clearance to manage the property and because of the unique circumstances surrounding the partnership's acquisition of the property, HUD was unconcerned that the TPA process was not completed prior to January 6, 1981. Petitioner was notified by HUD in a letter dated October 1, 1981, that petitioner's August 21, 1980, proposal had been formally accepted. This action was approved by the U.S. attorney by letter to petitioner's lawyer dated October 2, 1981. As a consequence, petitioner was required to fund only those repairs identified by HUD and included in the PWA. The PWA was subsequently executed by the parties on March 16, 1982. At the meeting at which the agreement was signed, HUD's regional counsel for the Chicago region guaranteed petitioner that after the repair program was completed, HUD would restructure the loans based on the property's cash flow at the time to insure: (1) That the mortgage indebtedness would be paid off, without placing *372 the partnership in default; and (2) that the partnership would receive a return on its investment in the property. The PWA required that the partnership realize no return on the investment during the workout period. It provided, inter alia, that the management fee for the property would not exceed 4.75 percent of gross rental collections; that cash flow which exceeded HUD's service charges, taxes and two-thirds interest due on the notes ($ 112,299.20), [4] was to be remitted to HUD monthly along with accounting statements; that prepayment of the mortgage notes was prohibited without HUD's prior written approval; and that the partnership consent to the continuing jurisdiction of the District Court to resolve any dispute which may arise from the implementation of the PWA. The PWA allowed petitioner to make capital improvements to the property according to its needs, but subject to the repairs required by the PWA. The PWA also stated that "At the end of the 60 month term of this Agreement and assuming all conditions have been met by the mortgagor, HUD will agree to either capitalize the then existing interest arrearages or negotiate further workout arrangements dependent upon the *373 project's financial status at such time." However, the PWA, itself, contained no terms restructuring the notes, such as a provision for a liquidated amount or terms of repayment of the principal and accrued interest on the defaulted notes. The partnership prepared two assumption agreements, purporting to cover the mortgages, notes, and regulatory agreements, and on April 19, 1982, Regents Park Partners signed those documents along with LaSalle. HUD did not execute either of the agreements and did not consider its signature necessary to bind the partnership. On March 22, 1984, the District Court ordered that petitioner deliver to HUD from the repair escrow the amount of $ 1,386,350, that HUD provide final and unconditional approval of the transfer of the physical assets to the partnership, and that the foreclosure action be dismissed with prejudice. HUD acknowledged receipt of the funds held in escrow on April 19, 1984. By *374 amendment, dated May 22, 1984, to the PWA, the commencement date for the PWA's 60-month term was changed from March 16, 1982, to April 1, 1984. On its 1981 Federal income tax return filed April 7, 1982, the partnership reported $ 37,706,945 as its beginning basis in the property, which sum included $ 828,361 attributable to 1980 real estate taxes, miscellaneous closing costs amounting to $ 495,000, and other costs in the amount of $ 186,493. The partnership allocated $ 36,451,945 of the property's basis to the improvements. HUD had escrowed at least $ 178,000 of the 1980 real estate tax due on the South Property and North Property by January 6, 1981. HUD paid $ 381,547.10 of the 1980 real estate tax on March 2, 1981, and the remaining $ 446,814.27 on October 1, 1981. Since September 22, 1981, the partnership has annually insured the property in an amount exceeding $ 40,000,000. The partnership has deducted the full amount of interest accruing on the notes each year. By 1986, the partnership had expended $ 5,095.550 on capital improvements, equipment and fixtures. Noncapitalized maintenance costs totaled $ 628,081, $ 384,219, and $ 462,755 for 1984, 1985, and 1986, respectively. *375 By Assignments of Beneficial Interest dated August 26, 1983, the two divisions of the partnership conveyed their interests in the property to the partnership. The Appraisers
Brian D. Flanagan (Flanagan) and Arthur J. Murphy (Murphy) appraised the property for petitioner and Richard J. Roddewig (Roddewig) did likewise for respondent. Each appraiser qualified as an expert pursuant to Rule 143(f) [5] and testified at trial. A. Flanagan
Flanagan used the cost approach, sales comparison approach, and the income capitalization approach in performing a retrospective appraisal of the property's value as of January 1, 1981. He determined that the highest and best use for the property was as a multifamily housing complex. Flanagan adopted an appraisal prepared by George Duffy (Duffy) that the land without improvements *376 had a fair market value of approximately $ 1,260,000. According to the income capitalization approach applied by Flanagan, the value of the property was $ 36,000,000. Flanagan concluded that the value of the property under the cost approach was $ 44,100,000. Flanagan's application of the sales comparison approach yielded a value of $ 36,330,000. Taking into account the results of each of the three methods, and placing the greatest weight on the income approach, Flanagan concluded that the value of the property on January 1, 1981, was $ 36,000,000. B. Roddewig
Roddewig determined that the highest and best use of the property was as a multi-family apartment building. Roddewig appraised the property using the cost, sales comparison, and income approaches. The cost approach yielded a value of $ 24,650,000; the sales comparison approach, a value of $ 22,840,000; and the income approach, a value of $ 20,000,000. Roddewig concluded that because of the unreliability of the cost approach in appraising a building that has undergone a high degree of depreciation, and the general difficulty of finding comparable properties, greater weight should be given to the results obtained *377 under the income approach than the other two methods. Thus, he estimated that the fair market value of the property, based upon a consideration of all three methods, was $ 21,000,000 on January 1, 1981. In Roddewig's opinion, the fair market value of the land by itself was $ 2,050,000. C. Murphy
Murphy had extensive experience in valuing condominiums as Chief Deputy Director of the Cook County Assessor's Office. Murphy determined that the highest and best use of the property in 1981 was as a condominium conversion. According to him, the net conversion value of the property for the partnership [6] was $ 40,400,000 as of January 1, 1981. Murphy considered but did not use either the cost or income approach, but instead relied only on a variation of the market data approach to value the property. His methodology required a determination of net income derived from the sale of *378 condominiums and time value of money considerations. Conclusions
The benefits and burdens of ownership of the property were acquired by petitioner on January 6, 1981. The property's fair market value on January 6, 1981, was $ 28 million. Respondent's Determinations
Respondent made numerous determinations with respect to the partnership's 1984, 1985, and 1986 Federal income tax returns, some of which have been resolved by concessions. The remaining determinations were that: (1) The acquisition of the property by the partnership was a sham; (2) the partnership failed to acquire the benefits and burdens of ownership of the property; (3) the nonrecourse debt to which the property was subject was not genuine since the purchase price of the property was substantially in excess of its fair market value; [7] (4) the depreciable basis of the property was overstated by $ 828,361, which amount represented the real estate taxes for 1980, paid in 1981 by HUD; (5) the partners' bases in their interests in the partnership were overstated because they included the allocable shares of nonrecourse debt which was in excess of the fair market value of the property; and (6) the gain from *379 the sale of a partner's interest in the partnership attributable to excess depreciation arising from the property's overvaluation must be treated as ordinary income. OPINION 1. Sham Transaction
Respondent asserts that the transaction was a sham primarily because it lacked economic substance. Where a taxpayer draws up "papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits", the tax benefits claimed will be denied on the basis that the transactions were shams. Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). To be recognized for Federal income tax purposes, a transaction must have a business *380 purpose and economic substance apart from anticipated tax consequences. Knetsch v. United States, 364 U.S. 361, 365-370 (1960); Hulter v. Commissioner, 91 T.C. 371, 388 (1988). Business purpose is present where the investment "was not motivated or shaped solely by tax avoidance features that have meaningless labels attached". Hilton v. Commissioner, 74 T.C. 305, 349-350 (1980), affd. 671 F.2d 316 (9th Cir. 1982). In general, the test for business purpose involves an inquiry of the investor's subjective purposes for entering into the transaction. Levy v. Commissioner, 91 T.C. 838, 854 (1988). Here, respondent concedes that this transaction does not represent a typical tax shelter. We are persuaded by the testimony of petitioner's shareholder and its president and by the objective facts that the partnership had the objective to make a profit from the transaction. Petitioner had extensive experience in managing real estate and benefited financially from managing this particular property. It operated as HUD's manager of the property from the time HUD took possession of the property *381 until the transfer to the divisions of the partnership. Further, petitioner was interested in acquiring the property prior to 1981, and only after its offers had been rejected did it submit a bid for the partnership to take the property subject to the debt. The partnership also controlled the cash flow from the operation of the property, and could invest the money in improving the property. We also find significant the fact that the interest rates on the notes were substantially below the rate on low-risk investments such as Government bonds in January 1981, and that the PWA provided for the restructuring of the notes. On the basis of the record, we conclude that the transaction had business purpose. The inquiry into economic substance involves an analysis of the objective factors that indicate whether the transactions have a reasonable opportunity of producing a profit, exclusive of tax benefits. Levy v. Commissioner, supra at 854. In Cherin v. Commissioner, 89 T.C. 986, 994-996 (1987), a case involving the alleged sale of cattle, this Court looked at the four following factors: (1) Whether the stated price for the property was within *382 the reasonable range of its value; (2) whether there was any intent that the purchase price would ever be paid; (3) the extent of the taxpayer's control over the property; and (4) whether the taxpayer would receive any benefit from the disposition of the property. Additional factors relevant here include: the presence of arm's-length negotiations; the structure of the financing; and the degree of adherence to contractual terms. Levy v. Commissioner, supra at 856. Given the nature of the negotiations between petitioner and HUD, we are satisfied that the terms for the most part were the result of arm's-length negotiations. Although we agree with respondent that this transaction should not be taken as an arm's- length transaction in that its purchase price should not be respected (see infra), nonetheless, it exhibited many of the characteristics of a valid transaction. In this regard, neither HUD, the Developer, nor the partnership were related parties. Further, HUD put the property out for bid by setting certain minimum requirements, which were either matched or exceeded by the two intervenors. With respect to whether the partnership ever intended *383 to pay the indebtedness, we find it significant that HUD, while not waiving any principal or accrued interest on the notes, nonetheless agreed to restructure the indebtedness following the expiration of the PWA. In this respect, we note that, even though the District Court may have prompted HUD to negotiate with the intervenors, there is nothing in the record to indicate that HUD was interested in foreclosing on the property immediately after the expiration of the PWA, although by the terms of the mortgage the partnership would still have been in default on the notes. The property also produced income in excess of expenses, when the mortgage obligations were not considered. Furthermore, the record indicates that the partnership had fulfilled the terms of the PWA. We reiterate that the prevalent low interest rates lead us to conclude that the present value of the principal amount and accrued interest was somewhat less than their stated amounts in 1981. Thus, we are persuaded that the transaction had economic substance. Consequently, the transaction was not a sham. [8]
*384 2. Benefits and Burdens of Ownership
The next issue to be decided is whether Regents Park was the owner of the property on January 6, 1981, i.e. that a sale of the property had occurred, which for Federal tax purposes does not obtain unless the partnership had acquired the benefits and burdens of ownership with respect to the property. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). We note that the availability of a depreciation deduction is not predicated upon the ownership of property but rather upon a capital investment in the property. Gladding Dry Goods Co. v. Commissioner, 2 B.T.A. 336 (1925). "The question of whether the benefits and burdens of ownership have been transferred is essentially one of fact to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances." Houchins v. Commissioner, 79 T.C. 570, 591 (1982). Petitioner bears the burden of proof on this issue. Rule 142(a); Haggard v. Commissioner, 24 T.C. 1124, 1130 (1955), affd. 241 F.2d 288 (9th Cir. 1956). *385 Factors considered relevant to this inquiry include: (1) Whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. * * * [Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238 (citations omitted).] Additional factors are "whether the purchaser has any control over the property and, if so, the extent of such control", Houchins v. Commissioner, supra at 591, and whether the transaction involved arm's-length dealing. Falsetti v. Commissioner, 85 T.C. 332, 348 (1985). Based upon the record, we find that the partnership had acquired the benefits and burdens of ownership of the property on January 6, 1981. The Developer's interests *386 in the trusts passed to the partnership on January 5, 1981. Neither the Developer nor HUD used the property nor were in possession of it after January 6, 1981. Further, the partnership was treated by the parties involved in the transaction as if it were the owner of the property, and the District Court and the U.S. attorney's office approved the transfer. See Illinois Power Co. v. Commissioner, 87 T.C. 1417, 1440-1442 (1986) (the view of a transaction by third parties should be considered in the analysis of ownership). In addition, nothing in the record indicates that the Developer and the partnership were related parties, nor that the transfer and the PWA were not negotiated at arm's length. Furthermore, the partnership made improvements to the property that indicated a continuing or long-term interest in the property beyond those required by the PWA, such as a swimming pool and grocery store. Under the terms of the PWA, the partnership was required to make certain payments to HUD. The partnership was responsible for making a minimum monthly payment to HUD covering taxes, services, and two-thirds of the annual interest. The partnership complied with this *387 and the other terms of the PWA. The partnership also invested approximately $ 1.3 million into the property to cover the repairs required by the terms of the PWA and a portion of the interest in arrears, thus subjecting some of its funds to risk of loss. Moreover, the partnership annually insured the property for more that $ 40 million. The unusual circumstances of this case also warrant consideration. In this regard, we note that petitioner made several attempts to acquire the property following its selection as the property's manager. In addition, although HUD desired to foreclose on the property, the District Court required HUD to put the property up for bid; and, despite attempts by petitioner to reduce the debt during negotiations leading to the PWA, HUD would not accept less than the full payment of the indebtedness to which the property was subject. However, HUD also agreed in the PWA to restructure the debt following the expiration of the PWA, based upon the property's income, so that the partnership would make a profit. The factor that most supports respondent's position is the fact that the partnership did not acquire an equity in the property if the purchase price *388 is taken to be the indebtedness to which the property is subject. In Torres v. Commissioner, 88 T.C. 702, 721-722 (1987), we explained that: The relevancy of equity, in a case where only nonrecourse debt is used in the purchase of property, is that the presence or absence of equity is likely to determine whether the purchaser of the property continues to act like the owner of the property. If equity is present, then economic considerations should lead the purchaser to continue to make payments on the nonrecourse debt and protect his interest in the property. * * * In this case the outstanding indebtedness to which the property was subject on the date of acquisition was $ 36,197,091. However, we have found that the property had a fair market value of $ 28 million on that date. Thus the partnership had no equity in the property as it is commonly understood. Certainly in many cases cited by respondent the fact that the transaction did not yield an equity for the buyer was a basis upon which the Court relied in holding that the transaction was not intended to change ownership. See Hulter v. Commissioner, 91 T.C. 371 (1988); Falsetti v. Commissioner, supra. *389 However, in the instant case, the exhibits and the testimony support the proposition that the partnership was the owner of the property. It made improvements to the property and dealt with all the parties involved in the transaction, as if it and not the Developer or HUD, was the owner of the property. In addition, the record indicates that the partnership has lived up to the terms of the PWA executed in 1982. Thus, we are persuaded, notwithstanding that the debt was nonrecourse and that its stated principal amount exceeds the fair market value of the property on January 6, 1981, that the partnership acquired the benefits and burdens of ownership to the property as of that date. We also note that the difference between the stated amount to which the property was subject and the property's fair market value may not properly measure economic equity in the circumstances of this case for several reasons. First, the PWA contained a provision in which HUD agreed, following the expiration of the PWA, to negotiate further workout arrangements depending on the financial status of the apartment buildings, such that both HUD and the partnership would receive a return on their investments. *390 Second, although neither party on brief raises the issue as to the present value of the notes, it is clear from the record that the then present values of the notes, including accrued interest, were significantly less than the stated amount in 1981. [9] The interest rates on the two notes were 7 and 8.5 percent, when in 1981 the interest rate on Federal bonds was over 10 percent. Furthermore, the record reveals that both petitioner and Shannon attempted to acquire the notes for amounts that were substantially less than the indebtedness on the property. Thus we are left with the strong impression that such economic considerations would motivate the partnership to continue to make payments according to the PWA and the nonrecourse notes. Respondent disputes that the partnership became the new owners on January 6, 1981, since no purchase price was determined. Furthermore, she *391 claims to find support for her position in the fact that no provision was made in the PWA for a liquidated amount, for the terms of repayment of the notes, and for the interest rate to be paid on any payment arrangement in the future. To a certain extent we agree with respondent that this transaction lacked these characteristics associated with a normal sale. However, the partnership took the property subject to the outstanding notes, the mortgages, and the regulatory agreements, executed the PWA with HUD, and acted and was perceived by other parties as the owner of the property. We hold that although not every factor favoring a transfer of ownership is evidently present, nonetheless in the circumstances of the instant case enough of these attributes of ownership were possessed by the partnership for us to hold that it was the owner of the property as of January 6, 1981, for purposes of the Federal income tax. [10]
*392 3. The Indebtedness to Which the Property was Subject Unreasonably Exceeded the Property's Fair Market Value
Several issues are raised by the parties with respect to the indebtedness to which the property was subject on January 6, 1981. One issue concerns whether the nonrecourse indebtedness is contingent. The second issue is whether the transfer of the property involved an arm's-length transaction to the extent that the nonrecourse indebtedness should be respected in determining the property's cost. The third issue concerns the determination of the property's fair market value. The fourth issue is whether the indebtedness should be disregarded pursuant to the analysis of Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975). A. Contingent Liability
Respondent argues that the indebtedness to which the property is subject should be considered a highly contingent or speculative obligation that is not recognized until the uncertainty surrounding it has been resolved. Fox v. Commissioner, 80 T.C. 972, 1020 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), *393 affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984). We note that this test applies to loans where the "sole security for such loans is a speculative asset with an undeterminable value at the time of purchase." Id. This analysis in general does not apply to the acquisition of rental real estate. Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986). Compare Ames v. Commissioner, T.C. Memo. 1990-87, affd. without published opinion 937 F.2d 616 (10th Cir. 1991), affd. sub nom. Lukens v. Commissioner, 945 F.2d 92 (5th Cir. 1991), affd. sub nom. Chesser v. Commissioner, 952 F.2d 411 (11th Cir. 1992) (acquisition financing of time share condominiums considered speculative where the interest was front-loaded, and it was obvious from the inception of the loan that the fair *394 market value of the time shares would never approach the amount of the indebtedness). In the instant case, the security for the indebtedness had considerable value, and the terms of the PWA modified the notes to the extent that it made it unlikely that HUD would foreclose on the property when the PWA expired. Instead what was envisioned was an accommodation through which the partnership would obtain a return on its investment. We are persuaded that the partnership would end up paying at least the equivalent of the property's fair market value, and that such result was expected at the time the property was acquired by the partnership, particularly where the property already had a positive cash flow in 1981. B. Arm's-Length Transaction
In general, the basis of property is its cost. Sec. 1012. The cost of property in most instances is equivalent to its purchase price. Lemmen v. Commissioner, 77 T.C. 1326 (1981). However, this rule "does not apply where a transaction is not conducted at arm's-length by two economically self-interested parties or where a transaction is based upon 'peculiar circumstances' which influence the purchaser to agree to a price *395 in excess of the property's fair market value." Bixby v. Commissioner, 58 T.C. 757, 776 (1972); see also C.G. Meaker Co. v. Commissioner, 16 T.C. 1348 (1951). Petitioner asserts that the stated principal amount and the accrued interest on the notes represent the purchase price [11] and the cost of the property, since the parties were dealing at arm's length. Respondent argues that the transfer from the Developer to the partnership as approved by HUD was not an arm's-length transaction, in that the behavior of HUD and petitioner in the context of this transaction fell short of what one would have expected of a willing seller and willing buyer, respectively. We agree with respondent that the circumstances of this case justify a different determination of cost. C.G. Meaker Co. v. Commissioner, supra; see also Estate of Anderson v. Commissioner, T.C. Memo. 1972-125. We note that there is, under the facts of this case, no evidence in the record to conclude that this transaction involved a gift or that either party "was attempting to help the other reduce its tax liability." C.G. Meaker Co. v. Commissioner, supra at 1354. *396 However, these facts do not equate to an arm's-length transaction in its ordinary sense. Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. 937 F.2d 612 (9th Cir. 1991). In this regard, respondent argues that HUD was not a willing seller, since the District Court required HUD to put the property up for bid between petitioner and Shannon and would not grant HUD foreclosure, which represented HUD's normal procedure. Furthermore, she asserts that there was no negotiation regarding price, since HUD treated the outstanding notes, including accrued interest, as the fair market value of the property. [12]
*397 The issue is whether, in the context of this acquisition of property subject to debt, the principal and accrued interest on the notes should be respected as reflecting the property's fair market value. In this regard, the record is replete with indications that, although not in themselves dispositive of the value of the property, the fair market value of the property was not related to the liens to which it was subject. HUD estimated in the latter half of the 1970's that, if it were to foreclose on and subsequently sell the property, it would receive only a fraction of the outstanding indebtedness. In an internal memorandum prepared in 1976, HUD speculated that at the end of 1977 the property would bring only $ 13.5 million and at the end of 1978 only $ 18.5 million, and in a 1978 memorandum HUD concluded that the fair market value of the property was $ 17.5 million, based upon an outside appraisal prepared for HUD. Further, both intervenors offered HUD $ 17.65 million for the property in early 1979. Also, during the negotiations leading up to the acceptance of the PWA, petitioner attempted to reduce the amount of the indebtedness to which the property was subject. HUD, however, *398 felt that it was legally prohibited from reducing that amount, and treated the outstanding indebtedness as the fair market value of the property. Although the following aspect of the case was not briefed by the parties, we note that, since the interest rate on low-risk investments in the acquisition year substantially exceeded the interest rates borne by the notes, the present values of the notes had to be considerably less than the total of their principal and accrued interest. [13] We conclude that the circumstances of this transaction were such that the face amount of indebtedness and the accrued interest was not representative of the property's fair market value. *399 Although we find that the principal amount of the notes and their accrued interest on January 6, 1981, did not constitute fair market value, nonetheless, the transaction was real and there is no evidence that the debt, at the time it was created, was not genuine. Having determined that the total outstanding indebtedness of the notes, in this circumstance, did not inherently represent the value of the property, we must determine cost for tax purposes by other means. This will require a determination of the property's fair market value on the date of acquisition, which issue we shall now address. C. Fair Market Value of the Property
Fair market value has been defined as "the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances". McShain v. Commissioner, 71 T.C. 998, 1004 (1979). This issue is a question of fact to be determined on the entire record, Skripak v. Commissioner, 84 T.C. 285, 320 (1985), and the burden of proof is on petitioner. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). *400 The fair market value of property reflects the highest and best use of property on the relevant valuation date. Stanley Works v. Commissioner, 87 T.C. 389, 400 (1986). "The realistic, objective potential uses for the property control the valuation thereof." 885 Investment Co. v. Commissioner, 95 T.C. 156, 167 (1990). We must determine "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". Olson v. United States, 292 U.S. 246, 255 (1934). The highest and best use of property is that use which is reasonably probable, legally and physically possible, financially feasible, and which results in the highest land value. See Todd v. United States, 617 F. Supp. 253, 256 (W.D. Pa. 1985). Whether the property is put to the highest use, or whether the owner ever intends to put the property to such use, is not relevant to the inquiry. Stanley Works v. Commissioner, supra at 400; Akers v. Commissioner, T.C. Memo. 1984-490, affd. 799 F.2d 243 (6th Cir. 1986). However, *401 "Legal restrictions on the use of property are relevant in determining whether an alleged use of property is reasonably probable." Stanley Works v. Commissioner, supra at 402. Both respondent and petitioner offered expert appraisals of the property to assist us in determining its fair market value. However, "We are not bound by the opinion of any expert witness when that opinion is contrary to our judgment." Parker v. Commissioner, 86 T.C. 547, 561 (1986). Furthermore, "We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate." Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Prospective information may be used in determining fair market value. In Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987), we stated: In general, property is valued as of the valuation date on the basis of market conditions and facts available on that date without regard to hindsight. However, we have held that postmortem events can be considered by the Court for the "limited purpose" of establishing what the willing buyer and seller's expectations were on the valuation date and *402 whether these expectations were "reasonable and intelligent." * * * Petitioner interprets this as essentially prohibiting the use of prospective events with respect to this valuation. We note, however, that this Court has already considered this matter in the context of the comparable sales method, and has stated that it is "appropriate to consider sales of properties occurring subsequent to the valuation date if the properties involved are indeed comparable to the subject properties", since fair market value is an objective determination. Estate of Thompson v. Commissioner, 89 T.C. 619, 628-629 n.7 (1987), revd. on other grounds 864 F.2d 1128 (4th Cir. 1989). In relying upon such subsequent sales, it must be shown that the adjustments made to the sales price were not speculative. Id. at 629. Petitioner claims that respondent's expert witness, Roddewig, in employing the income approach to valuation, relied on the partnership's actual rent and operating expenses for the years 1981 through 1989, when it is clear that a willing buyer would lack such accurate information on the valuation date. Petitioner also asserts that in using sales and *403 cost approaches, Roddewig relied in part on sales occurring more than 2 years following the date of transfer. The issue is whether these sales and actual income and expenses represented those expectations that a willing buyer or willing seller would have entertained in January 1981. We are persuaded that Roddewig's use of the income approach is in error to the extent that he incorporated data for years following 1981, and likewise we are persuaded that the use of the post-valuation date sales in the sales comparison and cost approaches was in error. Petitioner asserts that we must reject the rebuttal testimony of Roddewig with respect to his recomputation of both Murphy's appraisal and Flanagan's market-data approach, since Roddewig failed to submit an expert report in advance regarding this rebuttal testimony according to the notice provisions of Rule 143(f)(1). At trial, in overruling petitioner's objection to Roddewig's recomputation, we noted Rule 143(f)(2), which permits the Court to allow "an expert witness to testify without a written report where" that "testimony is based upon third-party contacts, comparable sales, statistical data, or other detailed, technical information", *404 and where that expert witness testifies "only in rebuttal to another expert witness." In this case, Roddewig testified as a witness in respondent's case-in-chief, for which he had submitted a written report in accordance with Rule 143(f)(1), and also in rebuttal to petitioner's expert witnesses. A written report regarding his testimony in rebuttal was not required. Rule 143(f)(2). Having duly considered petitioner's objection we see no reason to reverse our ruling at trial. (1) Value of the Property as Unimproved
The parties and their experts disagree as to the value of the land as of January 6, 1981. [14] Initially, we note that Flanagan did not independently value the land but instead, relied entirely on an appraisal prepared by Duffy. This appraisal was excluded from evidence, and therefore we do not consider it for purposes of determining the valuation of the land. Respondent's *405 expert, Roddewig, used the comparable sales approach and determined that the value of the property as unimproved was $ 15/foot. He relied on the sales prices of three properties. However, petitioner takes issue with Roddewig's analysis since one of his comparables was sold over 2 years after the transaction in question. We agree with petitioner that this sale deserves no consideration since we are not persuaded that the market conditions at the time of its sale were similar to those on January 6, 1981. [15] Incorporating this modification into Roddewig's analysis, we conclude that the fair market value of the unimproved property was $ 13/foot or $ 1,775,566. (2) Cost Approach
Flanagan and Roddewig relied only marginally on the value derived by their applications of the cost approach. They concluded that the property was not suitable for valuation by this method. We agree that in this circumstance the values derived by *406 this method were too speculative to accept, and we will neither address nor regard Flanagan's and Roddewig's valuations based on the cost approach. [16]
(3) Sales Comparison Approach
Flanagan and Roddewig both derived values for the property using the sales comparison approach, assuming that the property's highest and best use was as an apartment complex. Murphy's valuation of the property as a condominium conversion relied on a modified form of this approach. Respondent asserts that the properties used by Flanagan in the sales comparison approach were not valid comparables since they were located in better areas than Hyde Park, such as the Gold Coast and Lincoln Park. *407 Properties located in the Gold Coast region and Lincoln Park set the upper limits of value for property in Chicago as a whole. Further, Murphy testified that the properties used by Flanagan would not be considered comparables unless there were no similar properties in Hyde Park. We are persuaded that there were few comparables in Hyde Park, and thus Flanagan was not in error in using sales from other areas. However, although Flanagan claims to have made certain adjustments to his comparables, they are so cursorily treated in his analysis that they cast doubt on the value he derived. Roddewig recomputed Flanagan's sales comparison method by adjusting the sales prices for differences in net income (using Flanagan's 1980 net income figure for the property) and conversion value, and by adjusting the sales prices downward for the repair program required by the PWA, which he concluded was expected in 1981 to amount to $ 3.2 million. We find that the adjustments are warranted in that the comparables had expense ratios significantly less than that of the property, the properties were almost immediately converted to condominiums, and the repair program imposed extraordinary costs on *408 the property. We find, however, that Roddewig's adjustments for conversion value and the repair program were too great. We also find fault with Roddewig's use of the comparable sales approach, under which he valued the property at $ 22,000/unit. He relied on the sales of seven properties, four of which occurred after January 1981. He developed an adjustment grid that made price adjustments to his comparables for time of sale, the quality of the properties, and their functional utilities. Petitioner, however, asserts that the four sales that occurred after 1981 and as late as 1984 should be rejected under the analysis of Estate of Gilford v. Commissioner, supra, since there was an active market for the property. Petitioner also asserts that the other sales differed according to size and age to that of the property and that respondent's expert failed to account for these differences. In considering these objections to Roddewig's analysis, we find merit only in petitioner's claim that the sales which took place after the valuation date were too far removed in time to be probative of value. Respondent criticizes Murphy's appraisal on several grounds. First, *409 she asserts that we should reject Murphy's appraisal since the appraisal was undertaken without a determination of the property's highest and best use. Although it appears that he had been directed to appraise the property as a condominium conversion, we find that Murphy adequately determined that the property was suitable as a condominium conversion. [17]
Respondent argues further that HUD would not have allowed the conversion *410 to condominiums. We are persuaded that neither the PWA, statutory requirements, nor HUD policy would have prevented the conversion of the property to condominiums, if the required repairs had been completed. Furthermore, the record is clear that HUD did not have an official policy against condominium conversions of property which it insured. We find respondent's assertion without merit. As we have noted, however, the record is clear that petitioner had no expectation of doing a condominium conversion. Respondent further argues that it was not possible to comply with the legal requirements of converting the property to condominiums and to complete repairs required for conversion and by the PWA, as quickly as Murphy suggests. However, even Roddewig agreed that the repairs and legal requirements for conversion to condominiums could possibly be completed or fulfilled in 6 months, except for the repairs to the concrete. Based on this testimony and the testimony of witnesses for petitioner, we are persuaded that the legal constraints would not have been an obstacle for conversion to condominiums. Furthermore, we are persuaded that the repairs could have been completed within 6 months, *411 other than the work on the concrete. The experts differ as to the percentage of units that would be sold to tenants, with Murphy stating that a 50-percent rate is reasonable, and Roddewig maintaining that rate is not feasible. Murphy asserted that 62 percent of the units would be sold in the first year, and the remaining 38 percent over the next 2 years. Roddewig opined that it would take more than 3 years to sell the 1,038 units arising out of the condominium conversion of the property. Roddewig recomputed Murphy's appraisal based on the following modifications. Roddewig assumed that the repairs that would have had to have been undertaken for conversion to condominiums would have taken an additional 2 years to complete. Further, Roddewig estimated that the selling costs in the third year of conversion would have been 1 percent higher than Murphy estimated, and increased the costs to repair the concrete by $ 1,150,000. In addition, he maintained that a converter would require a 20-percent return, instead of the 10-percent return forecast by Murphy. We note that although Roddewig employed a 14-percent discount rate in his income approach, he applied a 15-percent discount with *412 respect to his redetermination of Murphy's appraisal. Roddewig also determined that the partnership would incur a financing cost in borrowing the money necessary to fund the conversion. Based upon the record, we conclude that Murphy's estimations were too optimistic. First, we agree with respondent that if conversion to condominiums had been undertaken, it would have been likely that the required architect's and engineering report would have revealed further damage to the concrete than had been previously known. Second, given the partnership's inexperience in the conversion to condominiums, and the need to locate someone to do the conversion, we find Murphy's time frame unrealistic. Third, we believe that, even if compliance with the legal requirements of converting property and the repairs could have been accomplished within 6 months, the condominiums could not have been sold as forecast by Murphy. In this regard, we note the testimony of Flanagan to the effect that there is in general a significant time lag between the time when one decides to convert a property to condominiums and when it actually occurs, and that one would not sell as much if one were to try to market the *413 condominiums at the same time that the conversion is underway. We further base this conclusion in part upon the presence of recession in 1981, the high interest rates during this period, and the slump in condominium sales at that time. In this regard, we were not provided with any evidence as to how long it took for the properties that Murphy used as comparables to convert to condominiums nor the time period in which the units in the buildings were sold. We note that some of the units of one of the comparables were still being sold in 1981 although the comparable was converted in 1978. Finally, we also agree that an entrepreneur who would undertake the conversion would have required a return greater than 10 percent since Treasury notes were bearing over 12-percent interest in early 1981. However, we disagree with the results of Roddewig's recomputation of Murphy's appraisal. Moreover, the record does not allow us to determine a value for the property as a condominium conversion, other than through sheer speculation. In this circumstance, we will disregard both appraisals regarding the conversion of the property to condominiums for purposes of determining its fair market value. *414 (4) Income Approach
We find fault with both appraisers' application of the income approach. With respect to Flanagan's appraisal, his estimates of net income were derived from incomplete data. He used data from the operations of the property for 1976, 1977, and the first half of 1978 to project the net income for the rest of 1978, and the years 1979 through 1986. These estimates differ significantly from the actual figures. The primary difficulty with his approach is that a willing buyer would have considered the revenue and expenses of the property associated with its operation up to and including 1980. Furthermore, we believe that the amount Flanagan set aside as capital reserve was insufficient, and that he did not factor in the estimated amount that the partnership would have to pay for capital repairs pursuant to the terms of the PWA. Roddewig's appraisal is also subject to criticism. Roddewig, instead of relying on income and expense amounts to which a buyer in early 1981 would have had access, incorporated the actual expense and revenue figures of the property for 1981 through 1989 into his analysis. Roddewig also failed to support why he provided for a capital *415 reserve of 2 percent of total effective gross income. [18] In addition, Roddewig estimated that the partnership would have to pay the maximum amount for the repair program required by the PWA. The appraisals differ as to the appropriate discount and capitalization rates to use. Roddewig applied a 14-percent discount rate and capitalization rate of 11 percent to the net income stream. Flanagan, on the other hand, chose a 13-percent discount rate and an 8-percent capitalization rate. We agree with petitioner that determinations of the discount and capitalization rates are subjective. We find neither party's arguments with respect to these rates particularly compelling. In conclusion, we believe that both Flanagan's and Roddewig's valuations using the income approach were in error. Based on the record, we believe, however, that value lies approximately halfway between Roddewig's valuation of $ 21 million and Flanagan's valuation *416 of $ 36 million. We note that it is possible to reach this figure by incorporating the following data into the income approach. Although in general this Court will not use prospective events, nonetheless given that the record does not reveal what the income and expense figures were for either 1979 or 1980, we believe that the actual figures from 1981 for the property are near enough in time to January 1981 that a willing buyer's or seller's expectations would approximate these figures. In these circumstances, the income for 1981 is the best indicator of expected income flow for the future. In addition, if the income approach also incorporated a reserve account of 1.5 percent, a discount rate of 13.5 percent, a capitalization rate of 10 percent, and an estimated repair program of $ 1.5 million, the resulting value would approximate $ 28 million. (5) Fair Market Value
Based on the foregoing discussion and taking into account the entire record, as well as our best judgment, we have found that the fair market value of the property was $ 28 million on January 6, 1981. D. Estate of Franklin
This Court, based upon Crane v. Commissioner, 331 U.S. 1 (1947), *417 has held that basis includes the amount of a nonrecourse mortgage which is used to acquire the property or to which the property is subject. Mayerson v. Commissioner, 47 T.C. 340, 351 (1966); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801, 804 (1949). In certain circumstances, however, indebtedness will not be respected in determining cost, and hence basis. See sec. 1012. Respondent, relying upon Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. on different grounds 64 T.C. 752 (1975), urges us to find that the notes did not represent genuine indebtedness, and thus must be disregarded in determining the partnership's basis in the property and for purposes of determining the partnership's distributive share of interest deductions.[19] In Estate of Franklin, the Circuit Court held that where seller-financed nonrecourse indebtedness excessively exceeded the fair market value of the property, such indebtedness was not genuine. [20]
*418 This Court, in Hulter v. Commissioner, 91 T.C. at 390, explained that, where nonrecourse indebtedness exceeds the fair market value of the property: [21]
Neither the partnership nor the partners * * * are regarded as having any legitimate economic interest in the debt or in the property in the reasonably foreseeable future. Even if the value of the property increases, because of the excessive amount of debt principal vis a vis the value of the property, the point in time at which the investors likely will obtain any equity in the property is so remote that realistically the investors are likely to abandon or walk away from the transaction and from the nonrecourse debt. * * * In Estate of Franklin, the circuit court used a similar analysis and noted that the purported purchaser had no incentive to pay off the nonrecourse note because by abandoning the transaction the taxpayer "can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase." Estate of Franklin v. Commissioner, supra at 1048. *419 Respondent and petitioner set forth various analyses of the cases applying Estate of Franklin and come to different conclusions. Respondent, on the one hand, determined that the debt must closely approximate the fair market value of the property, while petitioner, on the other hand, asserts that under case law if the ratio of the property's fair market value to the indebtedness is less than 60 percent, then the nonrecourse indebtedness will be deemed to be excessive. Given our determination of the property's fair market value of $ 28 million, the ratio in this case is approximately 77 percent. Although one might find merit in attempting to lay down a bright-line rule, the analysis of Estate of Franklin reduces to the distinction between a transaction which merely constitutes a bad deal for the buyer and one in which the unpaid purchase price is inflated. See Hager v. Commissioner, 76 T.C. 759, 775 (1981). When the transaction is viewed in this manner, we do not think that an objective, willing buyer, including one with poor business sense, would have acquired this property for cash or its equivalent in an amount equal to the principal and accrued *420 interest to which the property was subject. We hold that the unpaid purchase price, in this case the outstanding indebtedness to which the property was subject not including the 1980 real estate tax ($ 36,197,091), did unreasonably exceed the property's fair market value. Petitioner argues further that if we find that the nonrecourse indebtedness excessively exceeded the fair market value of the property, that the partnership's basis in the property may not be entirely denied, but must be given a basis equal to its fair market value on the acquisition date. Pleasant Summit Land Corp. v. Commissioner, 863 F.2d 263 (3d Cir. 1988), revg. on this issue T.C. Memo. 1987-469. The court in that case reasoned that a rational lender would compromise the debt down to fair market value, prior to foreclosing on the property. This opinion has been criticized [22] and has never been adopted by this Court. For example, in Lebowitz v. Commissioner, 917 F.2d 1314, 1319 (2d Cir. 1990), revg. on other grounds T.C. Memo. 1989-178, the court, in holding that Pleasant Summit Land Corp. did not apply, emphasized that the analysis *421 under Estate of Franklin required one to look at the purchaser and not the creditor, and stated that it failed "to see how a taxpayer can have an incentive to pay a portion of a nonrecourse debt equal to the value of the security when an unreasonably large portion of that debt would continue to lack supporting value." See also Lukens v. Commissioner, 945 F.2d 92 (5th Cir. 1991), affg. Ames v. Commissioner, T.C. Memo. 1990-87. This Court has yet to decide whether, in the case of a transaction involving property subject to a mortgage which excessively exceeds its fair market value, Estate of Franklin, supra, or Pleasant Summit v. Commissioner, supra, should apply in determining basis. This issue, however, need not be resolved in the instant matter, for the rationale of Estate of Franklin is *422 inapplicable to the circumstances of this case. Since the rule of Estate of Franklin is predicated upon a determination that only in the case where the buyer has an equity in the property would it have any incentive to pay off the nonrecourse indebtedness, and since in this case the total amount of the debt and accrued interest exceeds the property's fair market value, the partnership would also lack the requisite equity interest. However, we believe that this result is inappropriate given petitioner's preacquisition interest in the property, the District Court's refusal to allow HUD to proceed with foreclosure, the relatively low interest rates on the notes at a time when the interest rate for Treasury bonds exceeded 10 percent, and the willingness of HUD to restructure the notes in 5 years based upon the income of the property at that time, making it unlikely that HUD would foreclose on the property following the expiration of the PWA. We conclude that given the structure of the indebtedness as modified by the PWA, the partnership had a legitimate economic interest to continue to make payments on the debt, and that it was unlikely to abandon or walk away from the transaction. *423 Since there is no reason to assume that the fair market value of the property would be less at the time the PWA expired than in 1981, we believe that the amount of indebtedness would be restructured to reflect this amount. Thus, we hold that under the particular circumstances of this case, which involves, inter alia, the acquisition of property subject to nonrecourse indebtedness that exceeds its fair market value, the partnership is entitled to a basis in the amount of the property's fair market value; and the indebtedness, to the extent that it exceeds fair market value, is treated as a contingent liability, and not as an addition to basis. See Pleasant Summit Land Corp. v. Commissioner, supra; Levy v. Commissioner, T.C. Memo. 1991-646; cf. Webber v. Commissioner, T.C. Memo. 1983-633. [23]
*424 4. Real Estate Taxes
We now address the issue of whether the 1980 real estate tax on the property which was paid by HUD in 1981 was properly includable in the partnership's basis in the property. Respondent determined that the partnership was not entitled to include in basis the amount of 1980 real estate taxes paid by HUD in two installments subsequent to January 6, 1981. [24] We agree with the parties that real estate taxes paid or assumed by a partnership attributable to a period preceding the date of acquisition of the property are to be added to the cost of the property and not deducted. Hyde v. Commissioner, 64 T.C. 300, 306 (1975); sec. 1.1012-1(b), Income Tax Regs. Furthermore, where advances are considered mortgage principal by the terms of the mortgage agreement and as such are subject to the mortgage interest rate, a taxpayer is entitled to deduct the amounts advanced as real estate taxes and interest due. Allan v. Commissioner, 86 T.C. 655, 661 (1986), affd. 856 F.2d 1169 (8th Cir. 1988). *425 Respondent argues that "the Partnership did not pay the taxes with its own funds and that no bonafide debt for the same was created, negotiated or even considered by HUD." We note initially that the 1980 real estate taxes were paid by HUD following the acquisition of the property by the partnership. In general, if real property tax is in arrears at the time of acquisition, its amount is considered a cost of acquisition. Here, however, HUD paid the tax. In this circumstance, the question becomes whether HUD paid the tax on behalf of the partnership so that the payment would have been deemed to have come from the partnership. We are not persuaded that HUD paid the tax for the partnership. Although petitioner elicited testimony from its president that, at the time of the property's acquisition, HUD had escrowed only $ 178,000 toward the payment of the 1980 real estate taxes, petitioner failed to adduce any documentation that the partnership provided at least a portion of the additional funds HUD used to pay the taxes or that payment by HUD constituted additional indebtedness pursuant to the terms of the mortgages. [25] In this case, petitioner failed to establish that the price *426 paid for the property reflected the inclusion of the taxes in arrears. See Magruder v. Supplee, 316 U.S. 394 (1942); Blackstone Theatre Co. v. Commissioner, 12 T.C. 801 (1949). Furthermore, since we hold that the partnership did not persuade us that, when it acquired the property, the obligation to pay the 1980 real property tax in arrears was its responsibility, we need not face the issue of whether the partnership's basis in the property should include this amount over and above the property's fair market value. Respondent is sustained on this issue. 5. Partners' Bases in *427 Their Interests in the Partnership
Section 752(c) provides that "a liability to which property is subject shall, to the extent of the fair market value of such property, be considered as a liability of the owner of the property." Section 752(a) provides that "Any increase in a partner's share of the liabilities of a partnership * * * shall be considered as a contribution of money by such partner to the partnership." A contribution of money by a partner to a partnership increases that partner's basis in his or her interest in the partnership by the amount of money contributed. Sec. 722. Respondent determined, in the alternative, that section 752(c) applied to the acquisition of the property, thereby limiting the inclusion of the liability, to which the property was subject, in the partners' bases in their interests in the partnership to the fair market value of the property. Petitioner, however, argues that section 752(c) is limited only to contributions and distributions of property subject to debt. In light of our holding that the amount of indebtedness that exceeded the property's fair market value is contingent debt, we hold for respondent to that extent. [26] The contingent *428 portion of the debt is not considered an obligation to pay for purposes of Federal tax law, and, therefore, would not be a liability of the partnership for purposes of section 752. To the extent of this fair market value/purchase price we have found, however, additions to the partners' cost basis in the partnership is warranted. 6. Jurisdiction Over the Characterization of Gain From the Sale of a Partner's Interest in the Partnership
Respondent in the FPAA also determined that upon the sale of a partner's interest in the partnership, the partner must treat the portion of any gain from excess depreciation, attributable to the property's overvaluation, as ordinary income. Although the issue was raised in the pleadings, it was not addressed by the parties at trial or on brief, nor was our jurisdiction over this issue challenged. However, "A jurisdictional issue can be raised by either *429 party or court sua sponta at any stage of the proceedings." Smith v. Commissioner, 96 T.C. 10, 13-14 (1991); Winchell v. Commissioner, T.C. Memo. 1983-221. For the following reasons, we hold that we lack jurisdiction over this matter. The partnership is subject to the unified audit and litigation proceedings for partnership items under sections 6221 through 6233. Section 6231(a)(3), however, limits partnership items to "any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent" the regulations provide. See Dial USA, Inc. v. Commissioner, 95 T.C. 1 (1990) (laying out the limitations and effect of a unified proceeding). The regulations do not provide that the character of the gain from the sale of a partner's interest in the partnership is an item more appropriately determined at the partnership level, nor does it appear to be an item that a partnership is required to take into account for its taxable year. See sec. 301.6231(a)(3)-1, Proced. & Admin. Regs. We note that respondent apparently relies on section 751(a) in her determination of the character *430 of such gain. In this regard, section 301.6231(a)(3)-1(a)(1)(vi), Proced. & Admin. Regs., includes as partnership items: Other amounts determinable at the partnership level with respect to partnership assets, investments, transactions and operations necessary to enable the partnership or the partners to determine -- * * * (E) the application of section 751(a) and (b). Thus, partnership items include, inter alia, the elements necessary to determine whether section 751(a) or (b) applies, but not its consequences. Further, they do not include the character of the partnership interests in the hands of the individual partner, so as to determine the type of gain or loss, whether ordinary or capital, which occurs when the individual partner disposes of his interest. We therefore conclude that this issue does not involve a partnership item, and is not properly a part of the FPAA herein, so that we do not have jurisdiction in the premises. Even if we were to hold -- and we do not -- that this issue involves a partnership item, we would nevertheless conclude that the FPAA in this case, with respect to this item, is improper and does not confer jurisdiction upon us to decide the *431 matter. As stated, the FPAA on this point simply purports to determine that in the event that a partner in the future sells or exchanges his partnership interest, the partner at that time must treat the portion of the gain which he realizes, if any, as ordinary income, to the extent that his basis in his partnership interest had been decreased in the past by the use of excess depreciation which was attributable to the property's overvaluation at the time the partnership acquired it. What is notable here is that the FPAA makes no determination that any partner has sold or exchanged his partnership interest, the price at which such transaction took place, whether such transaction produced a gain or a loss, the amount thereof, and the extent to which such resulting gain, if any, should be treated as ordinary income rather than capital gain. In Clovis I v. Commissioner, 88 T.C. 980, 982 (1987), we said: Because of the similar functions of the FPAA and the statutory notice of deficiency, we are convinced that the long established principle applicable to notices of deficiency, viz, that no particular form is necessary, should apply with equal force to a FPAA. * * *432 * As a corollary principle, whatever form a FPAA takes, it must minimally give notice to the taxpayer that respondent has finally determined adjustments to the partnership return. * * * [Citations omitted.] On this matter, the FPAA is fatally defective. It gives none of the information which is necessary in order for it to be called a final determination, resulting in adjustments to the partnership income and return. Accordingly, with respect to this issue, it is a defective FPAA and does not confer jurisdiction upon this Court to dispose of the matter, and it will be ignored in our final disposition under Rule 155. Decisions will be entered under Rule 155. Footnotes
1. Chicago Beach South Towers and Chicago Beach North Towers shall collectively be referred to as the Developer.↩
2. Under an Illinois land trust, the trustee has no authority or powers whatsoever except to hold the naked title to property for the benefit of the beneficiaries.↩
3. The indebtedness comprises the following obligations: ↩
South Property Mortgage
$ 12,644,000
North Property Mortgage
13,441,450
Interest arrearage -- South
3,423,317
Interest arrearage -- North
6,688,324
1980 Real Estate Tax
828,361
4. Apparently, under the terms of the notes no interest accrued on the interest in arrears.↩
5. All Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted, and all statutory references are to the Internal Revenue Code in effect for the years in issue.↩
6. The partnership was uninterested in undertaking a condominium conversion on its own, since it lacked experience for such a project.↩
7. Respondent, in the alternative, determined that the partnership had allocated an insufficient amount of its basis in the property to the underlying land. This matter shall be addressed in the section dealing with the third issue, since our holding there will necessitate an allocation of value to the land.↩
8. In general, a finding that a transaction lacked economic substance results in its being entirely disregarded for purposes of Federal income taxation. Thus, deductions arising out of cash payments attributable to the transaction will be denied. Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-627; Jackson v. Commissioner, T.C. Memo. 1991-250. In this regard, we note that respondent conceded prior to trial the issue whether the partnership entered into the activity for profit. Further, respondent did not raise the issue of whether the transaction lacked economic substance in her opening brief. Instead she addressed the issue only in her reply brief, linking it to her arguments on the benefits and burdens of ownership and on the unreasonable difference between the nonrecourse indebtedness and the property's fair market value.↩
9. See Jensen, "The Unanswered Question in Tufts: What was the Purchaser's Basis?", 10 Va. Tax Rev. 455, 475-479↩ (1991).
10. We note that, although ownership for Federal tax purposes is arguably distinct from its commonsense meaning, if we were to find that the partnership had not acquired the benefits and burdens of ownership, we would in effect be stating that no person owns the property. If we were dealing with a transaction involving seller financing and found that the benefits and burdens of ownership had not passed, the seller would be the appropriate party to whom ownership would be attributable, but in the circumstances of this case involving as it does the acquisition of property subject to a mortgage, neither the Developer, which has retained no further connection with the property, nor HUD appears to be suitable candidate to whom to attribute ownership of the property.↩
11. For the sake of discussion we assume that the purchase price here is the amount of the indebtedness to which the property was subject.↩
12. Respondent claims further that the partnership did not act like a willing buyer, since it failed to thoroughly investigate the extent of the concrete defect in the building. Petitioner, on the other hand, asserts that this information could not have been known at the time that the partnership acquired the property and that it was justified in relying on the conclusions of an engineering report made for HUD. Although the record is clear that HUD had a structural engineer prepare a report regarding this problem in 1979, this particular document is not in the record. There was testimony that the report called for a one-time expense of $ 300,000 to repair the concrete. Respondent urges us to disregard the testimony regarding the content of the report. Inferences from facts in the record regarding the report's content cut both ways. Since we determine in this Opinion that the outstanding indebtedness did not represent the property's fair market value on other grounds, we need not resolve the issue regarding the adequacy of the 1979 engineering report.↩
13. Although this Court has held that the present value of promissory notes carrying below-market interest rates executed in conjunction with the acquisition of property does not increase the fair market value of the property, Marine v. Commissioner, 92 T.C. 958, 984 (1989), affd. 921 F.2d 280 (9th Cir. 1991); Finkelman v. Commissioner, T.C. Memo. 1989-72, affd. 937 F.2d 612 (9th Cir. 1991); or that favorable seller financing will not be considered in comparing the purchase price of property to its fair market value, Pleasant Summit Land Corp. v. Commissioner, T.C. Memo. 1987-469, revd. on other grounds 863 F.2d 263 (3d Cir. 1988), affd. sub nom. Estate of Isaacson v. Commissioner, 860 F.2d 55 (2d Cir. 1988), however, this Court has held that the present value of a promissory note, where seller financing is provided on favorable terms, is relevant in determining the acquired property's fair market value. Goldstein v. Commissioner, 89 T.C. 535↩ (1987).
14. Both Flanagan and Roddewig agree that the highest and best use of the property if vacant is for residential development.↩
15. We find no merit in petitioner's other objections to Roddewig's valuation of the land.↩
16. We note that this Court does not accept the reproduction cost method of valuation without "proof that the value thus determined was the actual value" on the valuation date. Strong, Hewat & Co. v. Commissioner, 3 B.T.A. 1035, 1038 (1926). See also Rainier Companies v. Commissioner, T.C. Memo. 1977-351↩.
17. We note that the experts in this case agree that the only suitable use to which the property could be put is for multi-family residential use. Roddewig and Flanagan determined that this meant that the property would be used for apartments. Although conversion to condominiums seems to be a different use from that of an apartment complex, the uses are so close that we deem them not to be qualitatively different. Thus, we will respect Murphy's determination and analyze the value of the property as both a condominium conversion and as an apartment building in determining its most profitable use.↩
18. Nor did Flanagan provide much support for the amount he selected as capital reserve.↩
19. Petitioner's attempt to characterize the transaction in issue as one not involving a "tax shelter", implying that the rationale of Estate of Franklin v. Commissioner, 544 F.2d 1045 (9th Cir. 1976), affg. on different grounds 64 T.C. 752↩ (1975), is not applicable, is not persuasive. We note that if the indebtedness to which the property is subject does excessively exceed its fair market value on the date of acquisition, then the partnership, if unchallenged, would be in the same tax position as if the transaction had been set up by a tax shelter promoter.
20. In Narver v. Commissioner, 75 T.C. 53, 98 (1980), affd. 670 F.2d 855 (9th Cir. 1982), this Court adopted the analysis of Estate of Franklin v. Commissioner, supra↩.
21. Here we note that since the purchase price claimed by the partnership is the same as the property's indebtedness on Jan. 6, 1981, we are not faced with the issue of whether in applying the rule of Estate of Franklin v. Commissioner, supra, one should compare purchase price or the amount of the nonrecourse indebtedness with the property's fair market value. Compare Pleasant Summit Land Corp. v. Commissioner, T.C. Memo. 1987-469, revd. on other grounds 863 F.2d 263 (3d Cir. 1988), affd. sub nom. Estate of Isaacson v. Commissioner, 860 F.2d 55 (2d Cir. 1988); Taft v. Commissioner, T.C. Memo. 1987-542, n.5, with Lebowitz v. Commissioner, 917 F.2d 1314, 1318 (2d Cir. 1990), revg. on this ground T.C. Memo. 1989-178↩.
22. See Jensen, supra note 9 at 518-524; Shaviro, "Risk and Accrual: The Tax Treatment of Nonrecourse Debt", 44 Tax Law Rev. 401, 449-450↩ (1989).
23. See also Jensen, supra note 9 at 528-534; Shaviro, supra note 22 at 450; Andrews, "On Beyond Tufts", 61 Taxes 949, 950 (1983). These articles suggest that in proper circumstances the transferee of property subject to indebtedness in excess of its fair market value should be entitled to basis equivalent to that amount. In Lukens v. Commissioner, 945 F.2d 92 (5th Cir. 1991), affg. Ames v. Commissioner, T.C. Memo. 1990-87↩, the Court stated, in dicta, that where nonrecourse indebtedness bears no reasonable relationship to the fair market value of the underlying collateral, the debt should be recognized to the extent of the collateral's fair market value only in certain debtor/creditor relationships, such as, arguably, is present in the instant case.
24. We note that the parties did not claim that the 1980 real estate taxes were allocable pursuant to sec. 164(d).↩
25. The amount of nonrecourse indebtedness that the partnership reported on its 1981 return as owing to HUD as of the end of 1981 was $ 36,197,090. The fact that the same return also listed as a nonrecourse debt accrued real estate taxes in the amount of $ 869,779 does not support petitioner's argument since the accrual method partnership also deducted the like amount as real estate taxes for 1981.↩
26. A partner's share of partnership liabilities is a partnership item. Sec. 301.6231(a)(3)-1(a)(1)(v), Proced. & Admin. Regs.↩